(Slip Opinion)           OCTOBER TERM, 2010                    1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## CAMRETA *v.* GREENE, PERSONALLY AND AS NEXT FRIEND OF S. G., A MINOR, ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–1454.   Argued March 1, 2011—Decided May 26, 2011*

Nearly a decade ago, petitioner Camreta, a state child protective services worker, and petitioner Alford, a county deputy sheriff, interviewed then 9-year-old S. G. at her Oregon elementary school about allegations that her father had sexually abused her.  They did not have a warrant or parental consent to conduct the interview.  S. G. eventually stated that she had been abused.  Her father stood trial for that abuse, but the jury failed to reach a verdict and the charges were later dismissed.  S. G.'s mother, respondent here (hereinafter S. G.), subsequently sued Camreta and Alford on S G.'s behalf for damages under 42 U. S. C. §1983, alleging that the in-school interview breached the Fourth Amendment's proscription on unreasonable seizures.  The District Court granted summary judgment to the officials.  The Ninth Circuit affirmed.  The Court of Appeals first ruled that seizing S. G. absent a warrant, court order, parental consent, or exigent circumstances violated the Constitution.  But the court further held that the officials were entitled to qualified immunity from damages liability because no clearly established law had warned them of the illegality of their conduct.  The court explained that it had chosen to rule on the merits of the constitutional claim so that officials would be on notice that they could not dispense with traditional Fourth Amendment protections in this context.  Although the judgment entered was in their favor, Camreta and Alford petitioned this Court to review the Ninth Circuit's ruling that their conduct vio-

——————

*Together with No. 09–1478, *Alford, Deputy Sheriff, Deschutes County, Oregon* v. *Greene, Personally and as Next Friend of S. G., a Minor, et al.,* also on certiorari to the same court.

lated the Fourth Amendment.  S. G. declined to cross-petition for re-
view of the decision that the officials have immunity.

*Held*:

1. This Court generally may review a lower court's constitutional
ruling at the behest of government officials who have won final
judgment on qualified immunity grounds.  Pp. 4–14.

(a) The relevant statute confers unqualified power on this Court
to grant certiorari "upon the petition of any party."   28 U. S. C.
§1254(1).   That language covers petitions brought by litigants who
have prevailed, as well as those who have lost, in the courts below.
Pp. 4–5.

(b) An appeal brought by a prevailing party may satisfy Article
III's case-or-controversy requirement.  To comply with that require-
ment, litigants must demonstrate a "personal stake" in the suit.
*Summers* v. *Earth Island Institute*, 555 U. S. 488, ___.  The petitioner
has such a stake when he has "suffered an 'injury in fact'" that is
caused by "the conduct complained of" and that "will be 'redressed by
a favorable decision.'"  *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555,
560–561.  And the opposing party also must have an ongoing interest
in the dispute, so that the case features "'that concrete adverseness
which sharpens the presentation of issues.'"  *Los Angeles* v. *Lyons*,
461 U. S. 95, 101.  The parties must have the necessary stake not
only at the outset of litigation, but throughout its course.  *Arizonans
for Official English* v. *Arizona*, 520 U. S. 43, 67.  So long as the liti-
gants possess the requisite personal stake, an appeal presents a case
or controversy, no matter that the appealing party was the prevailing
party below.  See *Deposit Guaranty Nat. Bank* v. *Roper*, 445 U. S.
326, 332–336; *Electrical Fittings Corp.* v. *Thomas & Betts Co.*, 307
U. S. 241.

This Article III standard often will be met when immunized offi-
cials seek to challenge a determination that their conduct violated
the Constitution because that ruling may have prospective effect on
the parties.  So long as it remains good law, an official who regularly
engages in the challenged conduct as part of his job (as Camreta
does) must either change the way he performs his duties or risk a
meritorious damages action.   The official thus can demonstrate in-
jury, causation, and redressability.  And conversely, if the person who
initially brought the suit may again be subject to the challenged con-
duct, she has a stake in preserving the court's holding so that she will
have ongoing protection from the practice.  Pp. 5–7.

(c) This Court's prudential practice of declining to hear appeals
by prevailing parties does not bar consideration of immunized offi-
cials' petitions.  The Court has recognized exceptions to this pruden-
tial rule when there has been a "policy reaso[n] . . . of sufficient im-

portance to allow an appeal" by the winner below. *Deposit Guaranty*, 445 U. S., at 336, n. 7. Just such a reason exists in qualified immunity cases. The constitutional rulings that prevailing parties ask the Court to consider in these cases have a significant future effect on the conduct of public officials and the policies of the government units to which they belong. The rulings are self-consciously designed to produce this effect by establishing controlling law and preventing invocations of immunity in later cases. Moreover, they are so designed with this Court's permission, to promote clarity—and observance—of constitutional rules. Taken together, these features of qualified immunity cases support bending the usual rule to permit consideration of immunized officials' petitions.

To begin with the nature of these suits: Under §1983 and *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388, a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But if those officials are entitled to qualified immunity, a court can dismiss the damages claim without ever deciding its merits—and so the qualified immunity situation threatens to leave standards of official conduct permanently in limbo. To prevent that problem, this Court has permitted lower courts to determine whether a right exists before examining whether it was clearly established. See, *e.g., Pearson* v. *Callahan,* 555 U. S. 223, 237. Here, the Ninth Circuit followed exactly this two-step process so that it could settle a question of constitutional law and thereby guide the future conduct of officials.

Given its purpose and effect, such a decision is reviewable in this Court at an immunized official's behest. If the Court's usual prevailing party rule applied, the official would either have to acquiesce in a ruling he had no opportunity to contest in this Court, or defy the lower court's view, adhere to what has been declared an illegal practice, and invite further law suits and possible punitive damages. *Id.,* at 240–241. And applying this Court's usual bar on review would undermine the purpose of the two-step process, "which is to clarify constitutional rights without undue delay." *Bunting* v. *Mellen,* 541 U. S. 1019, 1024 (SCALIA, J., dissenting from denial of certiorari). Just as that purpose may justify an appellate court in reaching beyond an immunity defense to decide a constitutional issue, so too may it support this Court in reviewing the correctness of the lower court's decision.

This holding is limited in two respects. First, it addresses only this Court's authority to review cases in this procedural posture. The Court need not decide if an appellate court can also entertain an appeal from a party who has prevailed on immunity grounds. Second, the holding concerns only what the Court may review, not what the

Court actually will choose to review. Going forward, the Court will consider prevailing parties' petitions one by one in accord with its usual standards for granting certiorari. Pp. 7–14.

2. A separate jurisdictional problem requires the Court to dismiss this case at the threshold: The case is moot. In a dispute of this kind, both the plaintiff and the defendant ordinarily retain a stake in the outcome. That is true of Camreta, who remains employed as a child protective services worker, and so has an interest in challenging the Ninth Circuit's ruling requiring him to obtain a warrant before conducting an in-school interview. But S. G. can no longer claim the plaintiff's usual stake in preserving the court's holding because she no longer needs protection from the challenged practice. She has moved to Florida and is only months away from her 18th birthday and, presumably, from her high school graduation. When "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," there is no live controversy to review. *United States* v. *Concentrated Phosphate Export Assn., Inc.*, 393 U. S. 199, 203.

When a civil suit becomes moot pending appeal, this Court has authority to "direct the entry of such appropriate judgment, decree, or order, or require such further proceedings . . . as may be just under the circumstances." 28 U. S. C. §2106. The Court's "established" practice is to vacate the judgment below, see, *e.g., United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39, to ensure that "those who have been prevented from obtaining the review to which they are entitled [are] not . . . treated as if there had been a review," *ibid.* The point of vacatur is to prevent an unreviewable decision "from spawning any legal consequences." *Id.,* at 40–41. A constitutional ruling in a qualified immunity case is a legally consequential decision. When happenstance prevents this Court's review of that ruling, the normal rule should apply: Vacatur rightly "strips the decision below of its binding effect," *Deakins* v. *Monaghan*, 484 U. S. 193, 200, and clears "the path for future relitigation," *Munsingwear*, 340 U. S., at 40. Because mootness has frustrated Camreta's ability to challenge the Ninth Circuit's ruling that he must obtain a warrant before interviewing a suspected child abuse victim at school, that part of the Ninth Circuit's decision must be vacated. Pp. 14–18.

588 F. 3d 1011, vacated in part and remanded.

KAGAN, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, GINSBURG, and ALITO, JJ., joined. SCALIA, J., filed a concurring opinion. SOTOMAYOR, J., filed an opinion concurring in the judgment, in which BREYER, J., joined. KENNEDY, J., filed a dissenting opinion, in which THOMAS, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 09–1454 and 09–1478

_____

## BOB CAMRETA, PETITIONER
09–1454              *v.*
### SARAH GREENE, PERSONALLY AND AS NEXT FRIEND OF S. G., A MINOR, AND K. G., A MINOR


## JAMES ALFORD, DEPUTY SHERIFF, DESCHUTES COUNTY, OREGON, PETITIONER
09–1478              *v.*
### SARAH GREENE, PERSONALLY AND AS NEXT FRIEND OF S. G., A MINOR, AND K. G., A MINOR

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[May 26, 2011]

JUSTICE KAGAN delivered the opinion of the Court.

Almost a decade ago, a state child protective services worker and a county deputy sheriff interviewed a girl at her elementary school in Oregon about allegations that her father had sexually abused her. The girl's mother subsequently sued the government officials on the child's behalf for damages under Rev. Stat. §1979, 42 U. S. C. §1983, claiming that the interview infringed the Fourth Amendment. The United States Court of Appeals for the Ninth Circuit agreed, ruling that the officials had violated the Constitution by failing to obtain a warrant to conduct the interview. But the Court of Appeals further held that qualified immunity shielded the officials from monetary

liability because the constitutional right at issue was not clearly established under existing law.

The two officials sought this Court's review of the Ninth Circuit's ruling on the Fourth Amendment. We granted their petitions to examine two questions. First, may government officials who prevail on grounds of qualified immunity obtain our review of a court of appeals' decision that their conduct violated the Constitution? And second, if we may consider cases in this procedural posture, did the Ninth Circuit correctly determine that this interview breached the Fourth Amendment?

We conclude that this Court generally may review a lower court's constitutional ruling at the behest of a government official granted immunity. But we may not do so in this case for reasons peculiar to it. The case has become moot because the child has grown up and moved across the country, and so will never again be subject to the Oregon in-school interviewing practices whose constitutionality is at issue. We therefore do not reach the Fourth Amendment question in this case. In line with our normal practice when mootness frustrates a party's right to appeal, see *United States* v. *Munsingwear, Inc.*, 340 U. S. 36, 39 (1950), we vacate the part of the Ninth Circuit's opinion that decided the Fourth Amendment issue.

I

In February 2003, police arrested Nimrod Greene for suspected sexual abuse of a young boy unrelated to him. During the investigation of that offense, the boy's parents told police that they suspected Greene of molesting his 9-year-old daughter S. G. The police reported this information to the Oregon Department of Human Services, which assigned petitioner Bob Camreta, a child protective services caseworker, to assess S. G.'s safety. Several days later, Camreta, accompanied by petitioner James Alford, a Deschutes County deputy sheriff, went to S. G.'s elemen-

tary school and interviewed her about the allegations. Camreta and Alford did not have a warrant, nor had they obtained parental consent to conduct the interview. Although S. G. at first denied that her father had molested her, she eventually stated that she had been abused. Greene was indicted and stood trial for sexually abusing S. G., but the jury failed to reach a verdict and the charges were later dismissed.

Respondent Sarah Greene, S. G.'s mother, subsequently sued Camreta and Alford on S. G.'s behalf[1] for damages under 42 U. S. C. §1983, which authorizes suits against state officials for violations of constitutional rights. S. G. alleged that the officials' in-school interview had breached the Fourth Amendment's proscription on unreasonable seizures.[2]

The District Court granted summary judgment to Camreta and Alford, and the Ninth Circuit affirmed. The Court of Appeals first ruled that the interview violated S. G.'s rights because Camreta and Alford had "seize[d] and interrogate[d] S. G. in the absence of a warrant, a court order, exigent circumstances, or parental consent." 588 F. 3d 1011, 1030 (2009) (footnote omitted). But the court further held that the officials were entitled to qualified immunity from damages liability because no clearly established law had warned them of the illegality of their conduct. *Id.,* at 1031–1033.

The Ninth Circuit explained why it had chosen to rule on the merits of the constitutional claim, rather than merely hold that the officials were immune from suit. By addressing the legality of the interview, the court said, it

_____

[1] Because Greene filed suit as next friend for her minor daughter, we will refer to respondent as S. G. throughout this opinion.

[2] S. G. also sued Deschutes County, alleging that it has a policy of unconstitutionally seizing children in public schools. See 588 F. 3d 1011, 1020, n. 4 (CA9 2009). The District Court rejected this claim, and S. G. did not appeal that ruling to the Ninth Circuit. *Ibid.*

could "provide guidance to those charged with the difficult
task of protecting child welfare within the confines of
the Fourth Amendment." *Id.,* at 1022. That guidance came
in no uncertain terms: "[G]overnment officials investigat-
ing allegations of child abuse," the court warned, "should
cease operating on the assumption that a 'special need'
automatically justifies dispensing with traditional Fourth
Amendment protections in this context." *Id.,* at 1033.

Although the judgment entered was in their favor,
Camreta and Alford petitioned this Court to review the
Ninth Circuit's ruling that their conduct violated the
Fourth Amendment. S. G. declined to cross-petition for
review of the decision that the officials have immunity.
We granted certiorari. 562 U. S. ___ (2010).

## II

We first consider our ability to act on a petition brought
by government officials who have won final judgment on
grounds of qualified immunity, but who object to an appel-
late court's ruling that they violated the plaintiff's consti-
tutional rights. Camreta and Alford are, without doubt,
prevailing parties. The Ninth Circuit's decision shielded
them from monetary liability, and S. G. chose not to con-
test that ruling. So whatever else follows, they will not
have to pay S. G. the damages she sought. The question
we confront is whether we may nonetheless review the
Court of Appeals' holding that the officials violated the
Constitution.

The statute governing this Court's jurisdiction author-
izes us to adjudicate a case in this posture, and S. G. does
not contend otherwise. The relevant provision confers
unqualified power on this Court to grant certiorari "upon
the petition of *any* party." 28 U. S. C. §1254(1) (emphasis
added). That language covers petitions brought by liti-
gants who have prevailed, as well as those who have
lost, in the court below. See E. Gressman, K. Geller, S.

Shapiro, T. Bishop, & E. Hartnett, Supreme Court Practice 87 (9th ed. 2007) (hereinafter Stern & Gressman).

S. G., however, alleges two impediments to our exercise of statutory authority here, one constitutional and the other prudential. First, she claims that Article III bars review because petitions submitted by immunized officials present no case or controversy. See Brief for Respondent 31–39. Second, she argues that our settled practice of declining to hear appeals by prevailing parties should apply with full force when officials have obtained immunity. See *id.,* at 24–27. We disagree on both counts.

## A

Article III of the Constitution grants this Court authority to adjudicate legal disputes only in the context of "Cases" or "Controversies." To enforce this limitation, we demand that litigants demonstrate a "personal stake" in the suit. *Summers* v. *Earth Island Institute*, 555 U. S. 488, ___ (2009) (slip op., at 4) (internal quotation marks omitted); see also *United States Parole Comm'n* v. *Geraghty*, 445 U. S. 388, 395–397 (1980). The party invoking the Court's authority has such a stake when three conditions are satisfied: The petitioner must show that he has "suffered an injury in fact" that is caused by "the conduct complained of" and that "will be redressed by a favorable decision." *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992) (internal quotation marks omitted). And the opposing party also must have an ongoing interest in the dispute, so that the case features "that concrete adverseness which sharpens the presentation of issues." *Los Angeles* v. *Lyons*, 461 U. S. 95, 101 (1983) (internal quotation marks omitted). To ensure a case remains "fit for federal-court adjudication," the parties must have the necessary stake not only at the outset of litigation, but throughout its course. *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 67 (1997).

We have previously recognized that an appeal brought by a prevailing party may satisfy Article III's case-or-controversy requirement. See *Deposit Guaranty Nat. Bank* v. *Roper*, 445 U. S. 326, 332–336 (1980). Indeed, we have twice before allowed a party for whom judgment was entered to challenge an unfavorable lower court ruling. See *ibid.; Electrical Fittings Corp.* v. *Thomas & Betts Co.*, 307 U. S. 241 (1939).[3] In that context as in others, we stated, the critical question under Article III is whether the litigant retains the necessary personal stake in the appeal. *Deposit Guaranty*, 445 U. S., at 334. As we will explain, a court will usually invoke rules of "federal appellate practice" to decline review of a prevailing party's challenge even when he has the requisite stake. *Id.*, at 333; see *infra*, at 8. But in such a case, Article III is not what poses the bar; these rules of practice "d[o] not have [their] source in the jurisdictional limitations" of the Constitution. *Deposit Guaranty*, 445 U. S., at 333–334. So long as the litigants possess the personal stake discussed above, an appeal presents a case or controversy, no matter that the appealing party was the prevailing party below.

This Article III standard often will be met when immunized officials seek to challenge a ruling that their conduct violated the Constitution. That is not because a court has made a retrospective judgment about the lawfulness of the officials' behavior, for that judgment is unaccompanied by any personal liability. Rather, it is because the judgment may have prospective effect on the parties. The court in

_____

[3]The dissent discusses *Deposit Guaranty* and *Electrical Fittings* at length in an effort to distinguish them from this suit. See *post*, at 4–7 (opinion of KENNEDY, J.). But we do not say those cases are foursquare with this one on their facts; we rely on them only for the proposition that this Court has previously identified no special Article III bar on review of appeals brought by parties who obtained a judgment in their favor below. The dissent does not, because it cannot, dispute that simple point.

such a case says: "Although this official is immune from damages today, what he did violates the Constitution and he or anyone else who does that thing again will be personally liable." If the official regularly engages in that conduct as part of his job (as Camreta does), he suffers injury caused by the adverse constitutional ruling. So long as it continues in effect, he must either change the way he performs his duties or risk a meritorious damages action. Cf. *id.*, at 337–338 (discussing prevailing party's stake in a ruling's prospective effects). Only by overturning the ruling on appeal can the official gain clearance to engage in the conduct in the future. He thus can demonstrate, as we demand, injury, causation, and redressability.[4] And conversely, if the person who initially brought the suit may again be subject to the challenged conduct, she has a stake in preserving the court's holding. See *Erie* v. *Pap's A. M.*, 529 U. S. 277, 287–289 (2000); *Honig* v. *Doe*, 484 U. S. 305, 318–323 (1988); cf. *Lyons*, 461 U. S., at 111 (examining whether the plaintiff had shown "a sufficient likelihood that he will again be wronged in a similar way"). Only if the ruling remains good law will she have ongoing protection from the practice.

We therefore reject S. G.'s view that Article III bars us from adjudicating any and all challenges brought by government officials who have received immunity below. That the victor has filed the appeal does not deprive us of jurisdiction. The parties in such cases may yet have a sufficient "interest in the outcome of [a litigated] issue" to present a case or controversy. *Deposit Guaranty*, 445 U. S., at 336, n. 7.

——————

[4] Contrary to the dissent's view, see *post*, at 12, the injury to the official thus occurs independent of any future suit brought by a third party. Indeed, no such suit is likely to arise because the prospect of damages liability will force the official to change his conduct.

### B

Article III aside, an important question of judicial policy remains. As a matter of practice and prudence, we have generally declined to consider cases at the request of a prevailing party, even when the Constitution allowed us to do so. See, *e.g., Gunn* v. *University Comm. to End War in Viet Nam*, 399 U. S. 383, 390, n. 5 (1970); *New York Telephone Co.* v. *Maltbie*, 291 U. S. 645, 646 (1934) *(per curiam);* see also *Bunting* v. *Mellen*, 541 U. S. 1019, 1023 (2004) (SCALIA, J., dissenting from denial of certiorari) ("[O]ur practice reflects a 'settled refusal' to entertain an appeal by a party on an issue as to which he prevailed" (quoting Stern & Gressman 79 (8th ed. 2002))). Our resources are not well spent superintending each word a lower court utters en route to a final judgment in the petitioning party's favor. See *California* v. *Rooney*, 483 U. S. 307, 311 (1987) *(per curiam)* ("[T]hat the Court of Appeal reached its decision through analysis different than this Court might have used does not make it appropriate . . . for the prevailing party to request us to review it"). We therefore have adhered with some rigor to the principle that "[t]his Court reviews judgments, not statements in opinions." *Ibid.* (internal quotation marks omitted). On the few occasions when we have departed from that principle, we have pointed to a "policy reaso[n] . . . of sufficient importance to allow an appeal" by the winner below. *Deposit Guaranty*, 445 U. S., at 336, n. 7.

We think just such a reason places qualified immunity cases in a special category when it comes to this Court's review of appeals brought by winners. The constitutional determinations that prevailing parties ask us to consider in these cases are not mere dicta or "statements in opinions." *Rooney*, 483 U. S., at 311 (internal quotation marks omitted); see *Bunting*, 541 U. S., at 1023 (SCALIA, J., dissenting from denial of certiorari) (stating that such a determination is "*not* mere dictum in the ordinary sense").

They are rulings that have a significant future effect on the conduct of public officials—both the prevailing parties and their co-workers—and the policies of the government units to which they belong. See *supra*, at 6–7. And more: they are rulings self-consciously designed to produce this effect, by establishing controlling law and preventing invocations of immunity in later cases. And still more: they are rulings designed this way with this Court's permission, to promote clarity—and observance—of constitutional rules. We describe in more detail below these features of the qualified immunity world and why they came to be. We hold that taken together, they support bending our usual rule to permit consideration of immunized officials' petitions.

To begin, then, with the nature of these suits: Under §1983 (invoked in this case) and *Bivens* v. *Six Unknown Fed. Narcotics Agents*, 403 U. S. 388 (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights. But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," *Anderson* v. *Creighton*, 483 U. S. 635, 638 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, *Harlow* v. *Fitzgerald*, 457 U. S. 800, 818 (1982). That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

And indeed, our usual adjudicatory rules suggest that a court *should* forbear resolving this issue. After all, a "longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance

of the necessity of deciding them." *Lyng* v. *Northwest Indian Cemetery Protective Assn.*, 485 U. S. 439, 445 (1988); see also *Ashwander* v. *TVA*, 297 U. S. 288, 346–347 (1936) (Brandeis, J., concurring). In this category of qualified immunity cases, a court can enter judgment without ever ruling on the (perhaps difficult) constitutional claim the plaintiff has raised. Small wonder, then, that a court might leave that issue for another day.

But we have long recognized that this day may never come—that our regular policy of avoidance sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo. *County of Sacramento* v. *Lewis*, 523 U. S. 833, 841, n. 5 (1998). Consider a plausible but unsettled constitutional claim asserted against a government official in a suit for money damages. The court does not resolve the claim because the official has immunity. He thus persists in the challenged practice; he knows that he can avoid liability in any future damages action, because the law has still not been clearly established. Another plaintiff brings suit, and another court both awards immunity and bypasses the claim. And again, and again, and again. So the moment of decision does not arrive.[5] Courts fail to clarify uncertain questions, fail to address novel claims, fail to give guidance to officials about how to comply with legal requirements. See, *e.g., ibid.; Wilson* v. *Layne*, 526 U. S. 603, 609 (1999). Qualified immunity thus may frus-

—————

[5] The constitutional issue could arise in a case in which qualified immunity is unavailable—for example, "in a suit to enjoin future conduct, in an action against a municipality, or in litigating a suppression motion in a criminal proceeding." *Lewis*, 523 U. S., at 841, n. 5. A decision in such a case would break the repetitive cycle of qualified immunity defenses described above. But some kinds of constitutional questions do not often come up in these alternative settings. *Pearson* v. *Callahan*, 555 U. S. 223, 236 (2009); see *Lewis*, 523 U. S., at 841, n. 5 (noting that "these avenues w[ill] not necessarily be open").

trate "the development of constitutional precedent" and the promotion of law-abiding behavior. *Pearson* v. *Callahan*, 555 U. S. 223, 237 (2009).

For this reason, we have permitted lower courts to avoid avoidance—that is, to determine whether a right exists before examining whether it was clearly established. See, *e.g., ibid.; Lewis*, 523 U. S., at 841, n. 5. Indeed, for some time we *required* courts considering qualified immunity claims to first address the constitutional question, so as to promote "the law's elaboration from case to case." *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001). More recently, we have left this matter to the discretion of lower courts, and indeed detailed a range of circumstances in which courts should address only the immunity question. See *Pearson*, 555 U. S., at 236–242. In general, courts should think hard, and then think hard again, before turning small cases into large ones. But it remains true that following the two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials. *Id.,* at 236; see *id.*, at 236–242 (discussing factors courts should consider in making this determination).

Here, the Court of Appeals followed exactly this two-step process, for exactly the reasons we have said may in select circumstances make it "advantageous." *Id.,* at 242. The court, as noted earlier, explained that it was "address[ing] both prongs of the qualified immunity inquiry . . . to provide guidance to those charged with the difficult task of protecting child welfare within the confines of the Fourth Amendment." 588 F. 3d, at 1022. To that end, the court adopted constitutional standards to govern all in-school interviews of suspected child abuse victims. See *id.,* at 1030. And the court specifically instructed government officials to follow those standards going forward—to "cease operating on the assumption" that warrantless interviews are permitted. See *id.,* at 1033. With the law

thus clearly established, officials who conduct this kind of
interview will not receive immunity in the Ninth Circuit.
And the State of Oregon has done just what we would
expect in the wake of the court's decision: It has provided
revised legal advice, consonant with the Ninth Circuit's
ruling, to child protective services workers wishing to
interview children in schools. See Tr. of Oral Arg. 14. The
court thus accomplished what it set out to do: settle a
question of constitutional law and thereby guide the con-
duct of officials.

Given its purpose and effect, such a decision is review-
able in this Court at the behest of an immunized official.
No mere dictum, a constitutional ruling preparatory to a
grant of immunity creates law that governs the official's
behavior. If our usual rule pertaining to prevailing parties
applied, the official would "fac[e] an unenviable choice":
He must either acquiesce in a ruling he had no opportu-
nity to contest in this Court, or "defy the views of the
lower court, adhere to practices that have been declared
illegal, and thus invite new suits and potential punitive
damages." *Pearson*, 555 U. S., at 240–241 (internal quota-
tion marks and brackets omitted). And if our usual bar on
review applied, it would undermine the very purpose
served by the two-step process, "which is to clarify consti-
tutional rights without undue delay." *Bunting*, 541 U. S.,
at 1024 (SCALIA, J., dissenting from denial of certiorari).
This Court, needless to say, also plays a role in clarifying
rights. Just as that purpose may justify an appellate court
in reaching beyond an immunity defense to decide a con-
stitutional issue, so too that purpose may support this
Court in reviewing the correctness of the lower court's
decision.[6]

_____

[6] The dissent complains that our decision "allows plaintiffs to obtain
binding constitutional determinations on the merits that lie beyond this
Court's jurisdiction to review." *Post*, at 10. But that is not the case. It

Opinion of the Court

We emphasize, however, two limits of today's holding. First, it addresses only our own authority to review cases in this procedural posture. The Ninth Circuit had no occasion to consider whether it could hear an appeal from an immunized official: In that court, after all, S. G. appealed the judgment in the officials' favor. We therefore need not and do not decide if an appellate court, too, can entertain an appeal from a party who has prevailed on immunity grounds.[7] Second, our holding concerns only what this Court *may* review; what we actually will choose to review is a different matter. That choice will be governed by the ordinary principles informing our decision whether to grant certiorari—a "power [we] . . . sparingly exercis[e]." *Forsyth* v. *Hammond*, 166 U. S. 506, 514 (1897); see also *id.,* at 514–515 (this Court grants review "only when the circumstances of the case satisfy us that the importance of the question involved, the necessity of avoiding conflict [in the lower courts], or some matter affecting the interests of this nation . . . , demands such

───────────

is not this decision but our prior precedents that allow lower courts to issue "binding constitutional determinations" in qualified immunity cases even when the plaintiff is not entitled to money damages. And it is not our decision but the dissent that would insulate these rulings from this Court's power to review.

[7] We note, however, that the considerations persuading us to permit review of petitions in this posture may not have the same force as applied to a district court decision. "A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case." 18 J. Moore et al., Moore's Federal Practice §134.02[1][d], p. 134–26 (3d ed. 2011). Many Courts of Appeals therefore decline to consider district court precedent when determining if constitutional rights are clearly established for purposes of qualified immunity. See, *e.g., Kalka* v. *Hawk*, 215 F. 3d 90, 100 (CADC 2000) (Tatel, J., concurring in part and concurring in judgment) (collecting cases). Otherwise said, district court decisions—unlike those from the courts of appeals—do not necessarily settle constitutional standards or prevent repeated claims of qualified immunity.

exercise"); this Court's Rule 10. Our decision today does no more than exempt one special category of cases from our usual rule against considering prevailing parties' petitions. Going forward, we will consider these petitions one by one in accord with our usual standards.

## III

Although we reject S. G.'s arguments for dismissing this case at the threshold, we find that a separate jurisdictional problem requires that result: This case, we conclude, is moot.[8]

As we explained above, *supra,* at 6–7, in a dispute of this kind, both the plaintiff and the defendant ordinarily retain a stake in the outcome. That is true of one defendant here: Camreta remains employed as a child protective services worker, so he has an interest in challenging the Ninth Circuit's ruling requiring him to obtain a warrant before conducting an in-school interview.[9] But S. G.

---

[8] JUSTICE SOTOMAYOR maintains that, because this case is moot, "[t]here is no warrant for reaching th[e] question" whether immunized officials may obtain our consideration of an adverse constitutional ruling. *Post*, at 1 (opinion concurring in judgment). But this Court has never held that it may consider only one threshold issue per case. And here, as we will explain, *infra,* at 16–18, and n. 10, our discussion of reviewability is critical to our ultimate disposition of this suit. Moreover, that issue was fully litigated in this Court. We granted certiorari to consider whether "the Ninth Circuit's constitutional ruling [is] reviewable, notwithstanding that [the Court of Appeals] ruled in [the officials'] favor on qualified immunity grounds." Pet. for Cert. in No. 09–1454, p. i. And all the parties, as well as the United States as *amicus curiae*, addressed that question in their briefs and oral arguments. Compare Brief for Petitioner in No. 09–1454, pp. 41–44, Brief for Petitioner in No. 09–1478, p. 4, n. 1, Reply Brief for Petitioner in No. 09–1454, pp. 3–13, Reply Brief for Petitioner in No. 09–1478, pp. 5–6, Brief for United States as *Amicus Curiae* 11–20, and Tr. of Oral Arg. 4–14, 17–24, 54–58, with Brief for Respondent 24–42, and Tr. of Oral Arg. 27–31, 46–52.

[9] The same cannot be said for Deputy Sheriff Alford. In their briefs, the parties informed us that Alford no longer works for Deschutes

can no longer claim the plaintiff's usual stake in preserving the court's holding because she is no longer in need of any protection from the challenged practice. After we granted certiorari, we discovered that S. G. has "moved to Florida, and ha[s] no intention of relocating back to Oregon." Brief for Respondent 13, n. 13. What is more, S. G. is now only months away from her 18th birthday—and, presumably, from her high school graduation. See *id.,* at 31. S. G. therefore cannot be affected by the Court of Appeals' ruling; she faces not the slightest possibility of being seized in a school in the Ninth Circuit's jurisdiction as part of a child abuse investigation. When "subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur," we have no live controversy to review. *United States* v. *Concentrated Phosphate Export Assn., Inc.*, 393 U. S. 199, 203 (1968); see, *e.g., Atherton Mills* v. *Johnston*, 259 U. S. 13, 15–16 (1922) (suit contesting the validity of a child labor statute mooted when plaintiff-child was "[no longer] within the ages affected by the act"); *DeFunis* v. *Odegaard*, 416 U. S. 312 (1974) *(per curiam)* (suit challenging law school admissions policy mooted when plaintiff neared graduation). Time and distance combined have stymied our ability to consider this petition.

Camreta makes only one counterargument: He avers that S. G. has a continuing interest in the Ninth Circuit's constitutional ruling because it may help her establish a

---

County or in law enforcement. See Brief for Respondent 1, n. 2; Reply Brief for Petitioner in No. 09–1478. Because Alford will not again participate in a child abuse investigation, he has lost his interest in the Fourth Amendment ruling. See *supra*, at 6–7; cf. *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 67 (1997) (holding that the plaintiff's challenge to a state law affecting the performance of her job duties was mooted when she left state employment). But in light of Camreta's continuing stake, Alford's altered circumstances are immaterial to our resolution of this dispute, and we do not decide any questions that would arise if he were the only defendant.

municipal liability claim against Deschutes County. See Tr. of Oral Arg. 7; *id.,* at 8. S. G.'s initial complaint charged that the county has an official policy of unconstitutionally subjecting schoolchildren to police interrogation. See n. 2, *supra.* Finding no evidence of such a policy (even assuming that an unlawful seizure had occurred in this case), the District Court granted summary judgment to the county, App. to Pet. for Cert. in No. 09–1454, pp. 66–67, and S. G. did not appeal that ruling, 588 F. 3d, at 1020, n. 4. And although S. G. recently sought to reinstate her claim against the county, the District Court denied that motion. 6:05–cv–06047–AA, Docket Entry No. 139 (D Ore., Jan. 4, 2011). Whatever interest S. G. might have were her municipal liability claim still pending (an issue we need not and do not decide), we do not think S. G.'s *dismissed* claim against a *different* defendant involving a *separate* legal theory can save this case from mootness. See *Commodity Futures Trading Comm'n* v. *Board of Trade of Chicago*, 701 F. 2d 653, 656 (CA7 1983) (Posner, J.) ("[O]ne can never be certain that findings made in a decision concluding one lawsuit will not some day . . . control the outcome of another suit. But if that were enough to avoid mootness, no case would ever be moot").

We thus must decide how to dispose of this case. When a civil suit becomes moot pending appeal, we have the authority to "direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U. S. C. §2106. Our "established" (though not exceptionless) practice in this situation is to vacate the judgment below. See *Munsingwear*, 340 U. S., at 39; *Alvarez* v. *Smith*, 558 U. S. ___, ___ (2009) (slip op., at 6). "A party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance," we have emphasized, "ought not in fairness be forced to acquiesce in" that ruling. *U. S. Bancorp Mortgage Co.* v. *Bonner*

*Mall Partnership*, 513 U. S. 18, 25 (1994). The equitable remedy of vacatur ensures that "those who have been prevented from obtaining the review to which they are entitled [are] not . . . treated as if there had been a review." *Munsingwear*, 340 U. S., at 39.[10]

S. G. contends that vacatur is inappropriate in the qualified immunity context because that disposition would "undermine" the Court of Appeals' choice to "decide [a] constitutional questio[n]" to govern future cases. Brief for Respondent 41–42; Tr. of Oral Arg. 47. Far from counseling against vacatur, S. G.'s argument reveals the necessity of that procedural course. The point of vacatur is to prevent an unreviewable decision "from spawning any legal consequences," so that no party is harmed by what we have called a "preliminary" adjudication. *Munsingwear*, 340 U. S., at 40–41. As we have just explained, a consti-

_____

[10] Our analysis of the proper disposition of this case follows from our conclusion that government officials who secure a favorable judgment on immunity grounds may obtain our review of an adverse constitutional holding. See *supra*, at 12. As just noted, *Munsingwear* justified vacatur to protect a litigant who had the right to appeal but lost that opportunity due to happenstance. 340 U. S., at 39, 41. We have therefore left lower court decisions intact when mootness did not deprive the appealing party of any review to which he was entitled. See, *e.g., U. S. Bancorp Mortgage Co.*, 513 U. S., at 25 (holding that the appealing party had "surrender[ed] his claim to the equitable remedy of vacatur" by settling the case and thus "voluntarily forfeit[ing] his legal remedy by the ordinary processes of appeal"); *Karcher* v. *May*, 484 U. S. 72, 83 (1987) (holding that vacatur in light of mootness was not warranted when the losing party declined to file an appeal). So if immunized officials could not challenge an appellate decision in this Court, we would choose not to exercise our equitable authority to vacate that decision, even if the case later became moot. But here, as we have just explained, the theory that underlies our prior cases applying *Munsingwear* is satisfied: Vacatur expunges an adverse decision that would be reviewable had this case not become moot. See *Arizonans*, 520 U. S., at 74 (finding vacatur proper because, "when the mooting event occurred," the Arizona Attorney General was pursuing his "right to present argument on appeal").

tutional ruling in a qualified immunity case is a legally consequential decision; that is the very reason we think it appropriate for review even at the behest of a prevailing party. See *supra*, at 8–12. When happenstance prevents that review from occurring, the normal rule should apply: Vacatur then rightly "strips the decision below of its binding effect," *Deakins* v. *Monaghan*, 484 U. S. 193, 200 (1988), and "clears the path for future relitigation," *Munsingwear*, 340 U. S., at 40.

In this case, the happenstance of S. G.'s moving across country and becoming an adult has deprived Camreta of his appeal rights. Mootness has frustrated his ability to challenge the Court of Appeals' ruling that he must obtain a warrant before interviewing a suspected child abuse victim at school. We therefore vacate the part of the Ninth Circuit's opinion that addressed that issue, and remand for further proceedings consistent with this opinion.[11] See, *e.g.*, *Arave* v. *Hoffman*, 552 U. S. 117, 118–119 (2008) *(per curiam); Selig* v. *Pediatric Specialty Care, Inc.*, 551 U. S. 1142 (2007).

*It is so ordered.*

---

[11] Our disposition of this case differs slightly from the normal *Munsingwear* order vacating the lower court's judgment and remanding the case with instructions to dismiss the relevant claim. We leave untouched the Court of Appeals' ruling on qualified immunity and its corresponding dismissal of S. G.'s claim because S. G. chose not to challenge that ruling. We vacate the Ninth Circuit's ruling addressing the merits of the Fourth Amendment issue because, as we have explained, *supra,* at 11–12, that is the part of the decision that mootness prevents us from reviewing but that has prospective effects on Camreta. See *Walling* v. *James V. Reuter, Inc.*, 321 U. S. 671, 677 (1944) (observing that when a suit becomes moot, "this Court . . . may make such disposition of the whole case as justice may require"). But we emphasize that this unique disposition follows from the unique posture of this case and signals no endorsement of deviations from the usual *Munsingwear* order in other situations.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 09–1454 and 09–1478

————

BOB CAMRETA, PETITIONER
09–1454          *v.*
SARAH GREENE, PERSONALLY AND AS NEXT FRIEND OF
S. G., A MINOR, AND K. G., A MINOR


JAMES ALFORD, DEPUTY SHERIFF, DESCHUTES
COUNTY, OREGON, PETITIONER
09–1478          *v.*
SARAH GREENE, PERSONALLY AND AS NEXT FRIEND OF
S. G., A MINOR, AND K. G., A MINOR

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[May 26, 2011]

JUSTICE SCALIA, concurring.

I join the Court's opinion, which reasonably applies our precedents, strange though they may be. The alternative solution, as JUSTICE KENNEDY suggests, see *post*, at 13 (dissenting opinion), is to end the extraordinary practice of ruling upon constitutional questions unnecessarily when the defendant possesses qualified immunity. See *Saucier* v. *Katz*, 533 U. S. 194 (2001). The parties have not asked us to adopt that approach, but I would be willing to consider it in an appropriate case.

# SUPREME COURT OF THE UNITED STATES

————

Nos. 09–1454 and 09–1478

————

## BOB CAMRETA, PETITIONER
09–1454                *v.*
SARAH GREENE, PERSONALLY AND AS NEXT FRIEND OF
S. G., A MINOR, AND K. G., A MINOR


## JAMES ALFORD, DEPUTY SHERIFF, DESCHUTES
## COUNTY, OREGON, PETITIONER
09–1478                *v.*
SARAH GREENE, PERSONALLY AND AS NEXT FRIEND OF
S. G., A MINOR, AND K. G., A MINOR

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[May 26, 2011]

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER joins, concurring in the judgment.

I agree with the Court's conclusion that this case is moot and that vacatur is the appropriate disposition; unlike the majority, however, I would go no further. As the exchange between the majority and JUSTICE KENNEDY demonstrates, the question whether Camreta, as a prevailing party, can obtain our review of the Ninth Circuit's constitutional ruling is a difficult one. There is no warrant for reaching this question when there is clearly no longer a genuine case or controversy between the parties before us. See *Sinochem Int'l Co.* v. *Malaysia Int'l Shipping Corp.*, 549 U. S. 422, 436 (2007) (noting that when a court can "readily" dispose of a case on one threshold ground, it should not reach another one that "is difficult to determine"). Indeed, it is improper for us to do so. Cf. *U. S.*

*Bancorp Mortgage Co.* v. *Bonner Mall Partnership*, 513 U. S. 18, 21 (1994) ("[A] federal court [may not] decide the merits of a legal question not posed in an Article III case or controversy").

The majority suggests that we must decide whether Camreta has a "right to appeal" in order to vacate the judgment below under *United States* v. *Munsingwear, Inc.*, 340 U. S. 36 (1950). See *ante*, at 17, n. 10; see also *ante*, at 14, n. 8. But that view does not accord with our past practice. See *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 66, 70, 74–75 (1997) (ordering vacatur of a district court judgment without "resolv[ing]" our "grave doubts" about the petitioners' appellate standing or deciding whether the state Attorney General had a right to intervene as a party, and concluding only that he had statutory authority to "present argument" on appeal). Nor is it consistent with the principles underlying our mootness jurisprudence. See *Walling* v. *James V. Reuter, Inc.*, 321 U. S. 671, 677 (1944) ("If a judgment has become moot, this Court . . . may make such disposition of the whole case as justice may require"). In accordance with our normal procedure for disposing of cases that have become moot through no fault of the party seeking review, see *Bancorp*, 513 U. S., at 22–23; *Munsingwear*, 340 U. S., at 39–40, and n. 2, we should simply vacate the portion of the Ninth Circuit's opinion Camreta sought to challenge and remand with instructions to dismiss, see, *e.g.*, *Indiana State Police Pension Trust* v. *Chrysler LLC*, 556 U. S. ___ (2009) *(per curiam).*

# SUPREME COURT OF THE UNITED STATES

_____

Nos. 09–1454 and 09–1478

_____

BOB CAMRETA, PETITIONER
09–1454          *v.*
SARAH GREENE, PERSONALLY AND AS NEXT FRIEND OF
S. G., A MINOR, AND K. G., A MINOR


JAMES ALFORD, DEPUTY SHERIFF, DESCHUTES
COUNTY, OREGON, PETITIONER
09–1478          *v.*
SARAH GREENE, PERSONALLY AND AS NEXT FRIEND OF
S. G., A MINOR, AND K. G., A MINOR

ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[May 26, 2011]

JUSTICE KENNEDY, with whom JUSTICE THOMAS joins, dissenting.

Today's decision results from what is emerging as a rather troubling consequence from the reasoning of our recent qualified immunity cases. The Court is correct to note the problem presented when, on the one hand, its precedents permit or invite courts to rule on the merits of a constitutional claim even when qualified immunity disposes of the matter; and, on the other hand, jurisdictional principles prevent us from reviewing those invited rulings. It does seem that clarification is required. In my view, however, the correct solution is not to override jurisdictional rules that are basic to the functioning of the Court and to the necessity of avoiding advisory opinions. Dictum, though not precedent, may have its utility; but it ought not to be treated as a judgment standing on its own.

So, while acknowledging the problem the Court confronts, my concern with the rule adopted for this case calls for this respectful dissent.

I

The Court acknowledges our "settled refusal to entertain an appeal," including a petition for certiorari, "by a party on an issue as to which he prevailed." *Ante*, at 8 (internal quotation marks omitted). At the outset, however, it is important to state this rule more fully to show its foundational character. A party that has already obtained the judgment it requested may not seek review to challenge the reasoning of a judicial decision. As we have said on many occasions, "This Court reviews judgments, not statements in opinions." *California* v. *Rooney*, 483 U. S. 307, 311 (1987) *(per curiam)* (internal quotation marks omitted); see also *Chevron U. S. A. Inc.* v. *Natural Resources Defense Council, Inc.*, 467 U. S. 837, 842, and n. 8 (1984) (collecting cases). The rule has been noted and followed since the early years of this Court. "The question before an appellate Court is, was the *judgment* correct, not the *ground* on which the judgment professes to proceed." *McClung* v. *Silliman*, 6 Wheat. 598, 603 (1821).

The rule against hearing appeals or accepting petitions for certiorari by prevailing parties is related to the Article III prohibition against issuing advisory opinions. This principle underlies, for example, the settled rule against hearing cases involving a disputed judgment based on grounds of state law. As Justice Jackson explained for the Court: "[O]ur power is to correct wrong judgments, not to revise opinions. We are not permitted to render an advisory opinion, and if the same judgment would be rendered by the state court after we corrected its views of federal laws, our review could amount to nothing more than an advisory opinion." *Herb* v. *Pitcairn*, 324 U. S. 117, 125–126 (1945). This point has been repeated with force and

clarity. See, *e.g.*, *Michigan* v. *Long*, 463 U. S. 1032, 1041–
1042 (1983). The "'judicial Power' is one to render dis-
positive judgments," not advisory opinions. *Plaut* v.
*Spendthrift Farm, Inc.*, 514 U. S. 211, 219 (1995) (internal
quotation marks omitted).

   The rule against hearing appeals by prevailing parties
applies in countless situations, many involving govern-
ment parties. Deficient performance may not yield preju-
dice under *Strickland* v. *Washington*, 466 U. S. 668 (1984).
A defective warrant may be entitled to good-faith reliance
under *United States* v. *Leon*, 468 U. S. 897 (1984). An
unreasonable search may be cured through the inevitable
discovery doctrine of *Nix* v. *Williams*, 467 U. S. 431 (1984).
In these and myriad other situations, an error is identi-
fied, but that conclusion does not affect the ultimate
judgment entered. In all these contexts, it is established
that the prevailing party may not appeal. This conclusion
holds true even though a statement on the merits can
have adverse consequences for the prevailing party. "The
Court of Appeal's use of analysis that may have been
adverse to the State's long-term interests does not allow
the State to claim status as a losing party for purposes of
this Court's review." *Rooney, supra*, at 311.

   The Court nonetheless holds that defendants who pre-
vail in the Courts of Appeals based on qualified immunity
may still obtain review in this Court. This point is put in
perspective by the fact that the Court today, in an alto-
gether unprecedented disposition, says that it vacates not
a judgment but rather "part of the Ninth Circuit's opin-
ion." *Ante*, at 2. The Court's conclusion is unsettling in its
implications. Even on the Court's reading of our cases, the
almost invariable rule is that prevailing parties are not
permitted to obtain a writ of certiorari. Cf. *Kalka* v.
*Hawk*, 215 F. 3d 90, 96, n. 9 (CADC 2000) (concluding that
the Supreme Court "has apparently never granted the
certiorari petition of a party who prevailed in the appel-

late court"). After today, however, it will be common for prevailing parties to seek certiorari based on the Court's newfound exception. And that will be so even though the "admonition" against reviewing mere statements in opinions "has special force when the statements raise constitutional questions, for it is our settled practice to avoid the unnecessary decision of such issues." *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 734 (1978).

The Court defends its holding with citations to just two of our cases. *Ante*, at 6. Neither provides support for the Court's result.

The first case is *Electrical Fittings Corp.* v. *Thomas & Betts Co.*, 307 U. S. 241 (1939). There, a plaintiff alleged the infringement of two patent claims. The District Court found the plaintiff's first claim valid but not infringed and the second claim invalid. Rather than issuing a judgment "dismissing the bill without more," the District Court instead "entered a decree adjudging claim 1 valid" and "dismissing the bill for failure to prove infringement." *Id.*, at 241–242. The District Court thus issued a formal judgment regarding the validity of the first claim. The defendant appealed to dispute that claim's validity. This Court noted, without qualification, that a party "may not appeal from a judgment or decree in his favor, for the purpose of obtaining a review of findings he deems erroneous which are not necessary to support the decree." *Id.*, at 242. "But," this Court went on to explain, "here the decree itself purports to adjudge the validity of claim 1, and though the adjudication was immaterial to the disposition of the cause, it stands as an adjudication of one of the issues litigated." *Ibid.* In other words, the District Court had entered an unnecessary legal conclusion into the terms of the judgment itself, making it possible, for example, that the decree would have estoppel effect as to an issue whose resolution was unnecessary to the proper judgment of dismissal. *Electrical Fittings* therefore concluded that

"the petitioners were entitled to have this portion of the decree eliminated." *Ibid.* The sole relief provided was an order for the "reformation of the decree." *Ibid.* That result accords with, indeed flows from, the settled rule that this Court reviews only judgments, not statements in opinions.

The second case is *Deposit Guaranty Nat. Bank* v. *Roper*, 445 U. S. 326 (1980). In that case plaintiffs attempted to bring a class action against a bank. After the District Court denied class certification, the defendant tendered to the plaintiffs the maximum value that they could recover as individuals. Of course, that offer did not amount to "all that ha[d] been requested in the complaint"—namely, "relief for the class." *Id.*, at 341 (Rehnquist, J., concurring). It is therefore no surprise that the plaintiffs responded with "a counteroffer of judgment in which they attempted to reserve the right to appeal the adverse class certification ruling." *Id.*, at 329 (opinion of the Court). But that proposal was denied. "Based on the bank's offer, the District Court entered judgment in respondents' favor, over their objection." *Id.*, at 330. The District Court thus issued a judgment other than the one the plaintiffs had sought. The would-be class plaintiffs appealed, and this Court later granted certiorari. The Court held that appeal was not barred by the prevailing-party rule: "We view the denial of class certification as an example of a procedural ruling, collateral to the merits of a litigation, that is appealable after the entry of final judgment." *Id.*, at 336. As the Court explained, the plaintiffs had obtained only a judgment in their individual capacities. Yet the plaintiffs had "asserted as their personal stake in the appeal their desire to shift to successful class litigants a portion of those fees and expenses that have been incurred in this litigation." *Id.*, at 334, n. 6; see also *id.*, at 336. Because the purported prevailing parties were injured by their failure to obtain the class-based

judgment they had sought, the Court held there was "jurisdiction to entertain the appeal only to review the asserted procedural error, not for the purpose of passing on the merits." *Ibid*. The Court was clear that the District Court's denial of class certification had a direct effect on the judgment: "As in *Electrical Fittings*," the purported prevailing parties "were entitled to have [a] portion of the District Court's judgment reviewed." *Ibid*.

Neither *Electrical Fittings* nor *Deposit Guaranty* provides support for the rule adopted today. Those decisions instead held that, in the unusual circumstances presented, particular parties who at first appeared to have prevailed below had in fact failed to obtain the judgments they had sought. This Court therefore had jurisdiction, including of course jurisdiction under Article III, to provide relief for the harm caused by the adverse judgments entered below. The parties seeking appeal in *Electrical Fittings* and *Deposit Guaranty* might be compared with plaintiffs who have requested $1,000 in relief but obtained only $500. Such parties have prevailed in part, but have not "receive[d] all that [they] ha[d] sought." *Deposit Guaranty*, *supra*, at 333. In contrast the Court appears to assume that the petitioners in the present case are true prevailing parties. They have obtained from the Court of Appeals the only formal judgment they requested: denial of respondent's claim for damages.

The Court points to policy concerns as the basis for its willingness to hear appeals by prevailing parties. *Ante*, at 8–10. But those concerns are unwarranted. In only one dissenting opinion has it been suggested that certiorari should be granted to reach a merits determination "locked inside" a favorable qualified immunity ruling. *Bunting* v. *Mellen*, 541 U. S. 1019, 1024 (2004) (SCALIA, J., dissenting from denial of certiorari). That dissenting opinion was issued in response to the rule that constitutional issues should be decided in every case involving qualified immu-

nity. *Id.*, at 1025. Yet that mandated rule of decision has now been disapproved, so the dissent's argument is no longer applicable. See *Pearson* v. *Callahan*, 555 U. S. 223 (2009). Indeed, the Court today suggests that it still would not allow review of the merits even in the case that provoked the dissent. Unlike petitioner Camreta, the petitioner in *Bunting* had left the Government's employ before filing a petition for certiorari and so lacked standing to obtain review in this Court. Compare 541 U. S., at 1025, n., with *id.*, at 1021 (Stevens, J., respecting denial of certiorari), and *ante*, at 14–15, and n. 9.

The instant case thus appears to be the first in which the Court's new exception to the prevailing party rule might have been applied. And even here that exception is neither necessary nor sufficient for the merits to be adjudicated by this Court. The Fourth Amendment question decided below is bound to arise again in future cases. Indeed, the reasoning of the decision below implicates a number of decisions in other Courts of Appeals. Cf. 588 F. 3d 1011, 1026, n. 11 (CA9 2009) (collecting cases). Yet today's decision does not supply the Courts of Appeals with guidance as to these merits issues. The Court instead vacates part of the reasoning of the decision below, thereby leaving other decisions intact and unreviewed. The Court thus resolves difficult constitutional issues and provides an unprecedented answer to "an important question of judicial policy," all to no end. *Ante*, at 7.

The Court errs in reading *Electrical Fittings* and *Deposit Guaranty* to permit review and, indeed, the provision of relief disconnected from any judgment. The result is an erroneous and unbounded exception to an essential principle of judicial restraint. Parties who have obtained all requested relief may not seek review here.

## II

As today's decision illustrates, our recent qualified im-

munity cases tend to produce decisions that are in tension with conventional principles of case-or-controversy adjudication. This Court has given the Courts of Appeals "permission" to find constitutional violations when ordering dismissal or summary judgment based on qualified immunity. *Ante*, at 9; see *Pearson*, *supra*. This invitation, as the Court is correct to note, was intended to produce binding constitutional holdings on the merits. *Ante*, at 10–11. The goal was to make dictum precedent, in order to hasten the gradual process of constitutional interpretation and alter the behavior of government defendants. *Ibid*. The present case brings the difficulties of that objective into perspective. In express reliance on the permission granted in *Pearson*, the Court of Appeals went out of its way to announce what may be an erroneous interpretation of the Constitution; and, under our case law, the Ninth Circuit must give that dictum legal effect as precedent in future cases.

In this way unnecessary merits decisions in qualified immunity cases could come to resemble declaratory judgments or injunctions. Indeed the United States as *amicus curiae* contends that the merits decision below "has an effect similar to an injunction or a declaratory judgment against the government as a whole." Brief for United States as *Amicus Curiae* 13. Today's opinion adopts that view, providing as relief the vacatur of "part of the Ninth Circuit's opinion"—namely, the part of the opinion that rules on the constitutional merits. *Ante*, at 2. For the first time, *obiter dictum* is treated not just as precedent for future cases but as a judgment in its own right.

The Court of Appeals in this case did not in fact issue a declaratory judgment or injunction embodying a determination on the merits, and it does not appear that a judgment of that kind could have issued. Plaintiffs must establish standing as to each form of relief they request, yet the plaintiff in this case had no separate interest in

obtaining a declaratory judgment. See *Los Angeles* v. *Lyons*, 461 U. S. 95, 103–105 (1983) (citing *Ashcroft* v. *Mattis*, 431 U. S. 171 (1977) *(per curiam); Golden* v. *Zwickler*, 394 U. S. 103 (1969)); see also *MedImmune, Inc.* v. *Genentech, Inc.*, 549 U. S. 118, 127 (2007). There was no likelihood that S. G., the plaintiff's daughter, would again be subjected to interrogation while at school, much less that she would be interrogated by petitioner-defendant Camreta, so S. G. would seem to have had no greater stake in obtaining a declaratory judgment than the plaintiff in *Lyons* had in obtaining an injunction. See 461 U. S., at 104 (noting the "actual controversy that must exist for a declaratory judgment to be entered"). Our qualified immunity cases should not permit plaintiffs in constitutional cases to make an end-run around established principles of justiciability. In treating dictum as though it were a declaratory judgment or an injunction, the Court appears to approve the issuance of such judgments outside the bounds of Article III jurisdiction.

The Court creates an exception to the prevailing party rule in order to solve the difficulties created by our qualified immunity jurisprudence, but the Court's solution creates new problems. Sometimes defendants in qualified immunity cases have no particular interest in disputing the constitutional merits. Acknowledging as much, the Court notes that petitioner Alford no longer works for the government and so "has lost his interest in the Fourth Amendment ruling." *Ante*, at 14, n. 9. In concluding that Alford lacks Article III standing, the Court suggests that it would lack jurisdiction to review and perhaps even to vacate the merits decision of the Court of Appeals if respondent had sued only Alford. *Ibid.;* cf. *Arizonans for Official English* v. *Arizona*, 520 U. S. 43, 72–73 (1997) (discussing standing to obtain review in this Court as well as this Court's jurisdiction to vacate judgments issued without jurisdiction). That suggestion is disconcerting.

Under today's decision, it appears that the Court's ability to review merits determinations in qualified immunity cases is contingent on the defendant who has been sued. A defendant who has left the government's employ or otherwise lacks an interest in disputing the merits will be unable to obtain further review. See *ante*, at 14, n. 9 (discussing Article III limits on relief in this Court)*; ante*, at 17, n. 10 (discussing limitations on this Court's equitable vacatur authority).

The Court today avoids this difficulty by concluding that petitioner Camreta has suffered an Article III injury. *Ante*, at 7; cf. *ante*, at 15, n. 9 ("[W]e do not decide any questions that would arise if [Alford] were the only defendant"). But the Court can reach that conclusion only because, "as part of his job," Camreta "regularly engages" in conduct made unlawful by the reasoning of the Court of Appeals. *Ante*, at 7. As discussed below, this conclusion is doubtful. See *infra*, at 11–13. In any event the Court's standing analysis will be inapplicable in most qualified immunity cases. Cf. *ante*, at 6 (asserting that the "Article III standard often will be met"). When an officer is sued for taking an extraordinary action, such as using excessive force during a high-speed car chase, there is little possibility that a constitutional decision on the merits will again influence that officer's conduct. The officer, like petitioner Alford or the petitioner in *Bunting*, would have no interest in litigating the merits in the Court of Appeals and, under the Court's rule, would seem unable to obtain review of a merits ruling by petitioning for certiorari. See *ante*, at 5–7; *ante*, at 14, n. 9, *ante*, at 17, n. 10; see also *Lyons*, *supra*, at 103–105. This problem will arise with great frequency in qualified immunity cases. Once again, the decision today allows plaintiffs to obtain binding constitutional determinations on the merits that lie beyond this Court's jurisdiction to review. The Court thus fails to solve the problem it identifies.

### III

It is most doubtful that Article III permits appeals by any officer to whom the reasoning of a judicial decision might be applied in a later suit. Yet that appears to be the implication of the Court's holding. The favorable judgment of the Court of Appeals did not in itself cause petitioner Camreta to suffer an Article III injury entitling him to appeal. Cf. *supra*, at 1–7 (discussing *Electrical Fittings* and *Deposit Guaranty*); *ASARCO Inc.* v. *Kadish*, 490 U. S. 605, 619 (1989) (finding an Article III controversy where petitioner challenged "a final judgment altering tangible legal rights"). On the contrary, Camreta has been injured by the decision below to no greater extent than have hundreds of other government officers who might argue that they too have been affected by the unnecessary statements made by the Court of Appeals. The Court notes as a limit on its authority to entertain appeals from prevailing parties certain statutory directives, directives that can be interpreted or shaped to allow expanded powers of review. *Ante*, at 4. But even if Congress were to give explicit permission for certiorari petitions to be filed by "any person" instead of by "any party," 28 U. S. C. §1254(1), the constitutional definition of a case or controversy would still constrain this Court's jurisdiction.

The Court's analysis appears to rest on the premise that the reasoning of the decision below in itself causes Camreta injury. Until today, however, precedential reasoning of general applicability divorced from a particular adverse judgment was not thought to yield "standing to appeal." *Parr* v. *United States*, 351 U. S. 513, 516, 517 (1956) (opinion for the Court by Harlan, J.). That is why "[o]nly one injured by the judgment sought to be reviewed can appeal." *Id.*, at 516; see also *supra*, at 1–6; *e.g.*, *Chathas* v. *Local 134 IBEW*, 233 F. 3d 508, 512 (CA7 2000) (Posner, J.) ("Adverse dicta are not appealable rulings. They can cause harm, but not the sort of harm that the courts . . .

deem to create a genuine controversy within the meaning of Article III of the Constitution. Judgments are appealable; opinions are not" (citations omitted)); *Sea-Land Serv., Inc.* v. *Department of Transp.*, 137 F. 3d 640, 648 (CADC 1998) (Williams, J.) ("[M]ere precedential effect within an agency is not, alone, enough to create Article III standing, no matter how foreseeable the future litigation" (citing *Radiofone, Inc.* v. *FCC*, 759 F. 2d 936, 938 (CADC 1985) (opinion of Scalia, J.))); *id.*, at 939 (explaining that standing must "arise from the particular activity which the agency adjudication has approved . . . and not from the mere precedential effect of the agency's rationale in later adjudications"); *Oxford Shipping Co.,* v. *New Hampshire Trading Corp.*, 697 F. 2d 1, 7 (CA1 1982) (Breyer, J.) ("Since the judgment appealed from was in [a party's] favor, and since the statement made was in no sense necessary to that judgment, the statement was dictum. There is no known basis for an appeal from a dictum"). It is revealing that the Court creates an exception to the prevailing party rule while making clear that the Courts of Appeals are not to follow suit, in any context. See *ante*, at 13–14.

The conclusion that precedent of general applicability cannot in itself create standing to sue or appeal flows from basic principles. Camreta's asserted injury is caused not by the Court of Appeals or by respondent but rather by "the independent action of some third party not before the court"—that is, by the still-unidentified private plaintiffs whose lawsuits Camreta hopes to avoid. *Lujan* v. *Defenders of Wildlife*, 504 U. S. 555, 560–561 (1992) (internal quotation marks omitted). This circumstance distinguishes the present case from requests for declaratory or injunctive relief filed against officeholders who threaten legal enforcement. An inert rule of law does not cause particular, concrete injury; only the specific threat of its enforcement can do so. That is why the proper defendant

in a suit for prospective relief is the party prepared to enforce the relevant legal rule against the plaintiff. See *MedImmune, Inc.*, 549 U. S., at 127 (explaining that declaratory relief requires a controversy "between parties having adverse legal interests, of sufficient immediacy and reality" (internal quotation marks omitted)); *Babbitt* v. *Farm Workers*, 442 U. S. 289, 298–299 (1979) ("A plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement"). Without an adverse judgment from which to appeal, Camreta has in effect filed a new declaratory judgment action in this Court against the Court of Appeals. This is no more consistent with Article III than filing a declaratory judgment action against this Court for its issuance of an adverse precedent or against Congress in response to its enactment of an unconstitutional law.

## IV

If today's decision proves to be more than an isolated anomaly, the Court might find it necessary to reconsider its special permission that the Courts of Appeals may issue unnecessary merits determinations in qualified immunity cases with binding precedential effect.

Other dynamics permit the law of the Constitution to be elaborated within the conventional framework of a case or controversy. "[T]he development of constitutional law is by no means entirely dependent on cases in which the defendant may seek qualified immunity." *Pearson*, 555 U. S., at 242–243. For example, qualified immunity does not bar Fourth and Fifth Amendment suppression challenges. See, *e.g.*, *Kentucky* v. *King*, *ante*, p. ___. Nor does it prevent invocation of the Constitution as a defense against criminal prosecution, civil suit, or cruel and unusual punishment. See, *e.g.*, *Snyder* v. *Phelps*, 562 U. S. ___ (2011); *Graham* v. *Florida*, 560 U. S. ___ (2010); *Law-*

*rence* v. *Texas*, 539 U. S. 558 (2003). Nor is qualified immunity available in constitutional suits against municipalities—as this very case illustrates. *Ante*, at 15–16. Our cases make clear, moreover, that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope* v. *Pelzer*, 536 U. S. 730, 741 (2002). That rule permits clearly established violations to be found when extreme though unheard-of actions violate the Constitution. See, *e.g.*, *ibid.* Furthermore, constitutional plaintiffs may seek declaratory or injunctive relief pursuant to standard principles of justiciability. Those plaintiffs do not need *Pearson*'s special rule. See, *e.g.*, *Citizens United* v. *Federal Election Comm'n*, 558 U. S. ___ (2010); *McDonald* v. *Chicago*, 561 U. S. ___ (2010). In any event, some incremental advance in the law occurs even when clearly established violations are found. It is an inevitable aspect of judicial decision-making that the resolution of one legal question or factual dispute casts light on the next.

It would be preferable at least to explore refinements to our qualified immunity jurisprudence before altering basic principles of jurisdiction. For instance, the objectives of qualified immunity might be satisfied if there were no bar to reaching the merits and issuing judgment when requested damages are nominal and substantial attorney's fees are waived or not allowed. Cf. *Farrar* v. *Hobby*, 506 U. S. 103, 112–115 (1992) (discussing unavailability of attorney's fees where nominal damages are only relief); *Hewitt* v. *Helms*, 482 U. S. 755, 761–763 (1987); *Harlow* v. *Fitzgerald*, 457 U. S. 800, 819, n. 34 (1982); *Carey* v. *Piphus*, 435 U. S. 247, 266 (1978) (discussing the propriety of providing nominal damages as relief).

The desire to resolve more constitutional questions ought not lead to altering our jurisdictional rules. That is the precise object that our legal tradition tells us we should resist. Haste to resolve constitutional issues has

never been thought advisable. We instead have encouraged the Courts of Appeals to follow "that older, wiser judicial counsel not to pass on questions of constitutionality . . . unless such adjudication is unavoidable." *Scott* v. *Harris*, 550 U. S. 372, 388 (2007) (BREYER, J., concurring) (internal quotation marks omitted); see generally *Ashwander* v. *TVA*, 297 U. S. 288, 347 (1936) (Brandeis, J., concurring). Experience teaches that there is no persuasive reason to reverse normal principles of judicial review in qualified immunity cases. Compare, *e.g.*, *Pearson*, *supra*, at 236, and *Siegert* v. *Gilley*, 500 U. S. 226, 235 (1991) (KENNEDY, J., concurring in judgment) ("[I]t seems to reverse the usual ordering of issues to tell the trial and appellate courts that they should resolve the constitutional question first"), with *id.*, at 232 (opinion of the Court), and *Saucier* v. *Katz*, 533 U. S. 194, 201 (2001). Yet this Court's "puzzling misadventure in constitutional dictum" still has not come to an end. Leval, Judging Under the Constitution: Dicta About Dicta, 81 N. Y. U. L. Rev. 1249, 1275 (2006).

There will be instances where courts discuss the merits in qualified immunity cases. It is sometimes a better analytic approach and a preferred allocation of judicial time and resources to dismiss a claim on the merits rather than to dismiss based on qualified immunity. And "[i]t often may be difficult to decide whether a right is clearly established without deciding precisely what the existing constitutional right happens to be." *Pearson*, *supra*, at 236 (internal quotation marks omitted). This Court should not superintend the judicial decisionmaking process in qualified immunity cases under special rules, lest it make the judicial process more complex for civil rights suits than for other litigation. It follows, however, that the Court should provide no special permission to reach the merits. If qualified immunity cases were treated like other cases raising constitutional questions, settled principles of con-

stitutional avoidance would apply.   So would conven-
tional rules regarding dictum and holding.  Judicial obser-
vations made in the course of explaining a case might give
important instruction and be relevant when assessing a
later claim of qualified immunity.  Cf. *Wilkinson* v. *Rus-
sell*, 182 F. 3d 89, 112, and n. 3 (CA2 1999) (Calabresi, J.,
concurring).  But as dicta those remarks would not estab-
lish law and would not qualify as binding precedent.  See
*Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 67 (1996).

\*    \*    \*

The distance our qualified immunity jurisprudence has
taken us from foundational principles is made all the more
apparent by today's decision.  The Court must construe
two of its precedents in so broad a manner that they are
taken out of their proper and logical confines.  To vacate
the reasoning of the decision below, the Court accepts that
*obiter dictum* is not just binding precedent but a judgment
susceptible to plenary review.  I would dismiss this case
and note that our jurisdictional rule against hearing ap-
peals by prevailing parties precludes petitioners' attempt
to obtain review of judicial reasoning disconnected from a
judgment.