Opinion for the Court filed by Circuit Judge TATEL.
*1197 Opinion concurring in part and concurring in the judgment filed by Circuit Judge ROGERS.
TATEL, Circuit Judge:
Concerned that contraband poses significant dangers to inmates and employees, many penal institutions strip search incoming detainees. The appropriateness of these invasive procedures doubtless looks different from the perspective of detainees such as Appellants — women forced to endure strip searches while awaiting presentment hearings at the District of Columbia Superior Court. Alleging that such searches violate the Fourth Amendment and, where men are not similarly strip searched, the Fifth Amendment’s equal protection guarantee, these women filed this class action against the District of Columbia and the former United States Marshal for the Superior Court who administered the Superior Court cellblock. Because men and women at the cellblock are now strip searched only upon individualized reasonable suspicion, we have no occasion to consider whether the policies under which class members were strip searched may continue. Rather, the only question in this case is whether class members can recover damages from the District or from the former Superior Court Marshal. The district court granted summary judgment to the District, concluding that because the Superior Court Marshal in charge of the cellblock was at all times a federal official acting under color of federal law, the city had no authority to prevent the strip searches. The district court also granted summary judgment to the Superi- or Court Marshal, finding him entitled to qualified immunity. We affirm both rulings.
I.
Under the Anti-Drug Abuse Act of 1988, Pub.L. No. 100-690, tit. VII, § 7608(a)(1), 102 Stat. 4181, 4512-15 (1988) (codified at 28 U.S.C. §§ 561-569), two United States Marshals serve the District of Columbia. The first, the U.S. Marshal for the District of Columbia, serves the U.S. District Court and this Court. 28 U.S.C. § 566(b). The second, the U.S. Marshal for the District of Columbia Superior Court, serves that court only. 28 U.S.C. § 561(c). During the time of the events at issue in this case, Appellee, Todd Dillard, served as Superior Court Marshal.
Sometime in the mid- to late-1990s, Dillard, concerned that detainees were bringing weapons, drugs, and other contraband into the cellblock, began requiring all incoming detainees to undergo a three-step search. Detainees first passed through metal detectors; they were then patted down by deputy marshals; and, finally, they were required to remove their clothing, squat, and cough to dislodge any hidden contraband. The parties refer to these “drop, squat, and cough” searches as strip searches. Given that “[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor,” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), we infer from the evidence presented that despite Dillard’s facially gender-neutral policy, deputy marshals in fact subjected male detainees to strip searches only upon individualized reasonable suspicion. By contrast, all women were forced to drop, squat, and cough. This included female pre-presentment arrestees charged with nonviolent, non-drug offenses. After completing the three-step search process, female pre-presentment arrestees proceeded to interview rooms outside presentment courtrooms. Roughly eighty percent of female arrestees were released following these hearings.
In 2002, a class of women detained and strip searched at the Superior Court cell- *1198 block filed this suit seeking damages and injunctive relief. After the United States Marshals Service halted strip searches without individualized reasonable suspicion, class members abandoned their claims for injunctive relief and filed an amended complaint in which they sought only monetary relief from the District of Columbia and Dillard, whom they sued in his personal and professional capacities. The District and Dillard separately moved to dismiss the complaint for failing to state any claims upon which relief could be granted. The district court denied both motions and certified two classes: a Fourth Amendment Class and a Fifth Amendment Class. The Fifth Amendment Class includes all female pre-presentment arrestees held at the Superior Court cell-block between December 2, 1999 and April 25, 2003 and subjected to strip searches “under similar circumstances for which men arrestees were not.” See Johnson v. District of Columbia, 584 F.Supp.2d 83, 86 (D.D.C.2008). The Fourth Amendment Class includes all female pre-presentment arrestees who, during the same time period, were strip searched without individualized reasonable suspicion or probable cause and who were arrested for non-drug, non-violent offenses. See id.
Following class certification, the district court entered summary judgment in favor of the District. Believing that the Superi- or Court Marshal is a federal official who acted at all times under color of federal law, and that the District therefore had no choice but to turn pre-presentment arres-tees over to the Marshal, the court concluded that the District could not be held liable for any unconstitutional acts of the Marshal. Id. at 90-93.
After further discovery, the district court orally granted Dillard summary judgment on all claims against him in his professional capacity, finding that his status as a federal official left him beyond the reach of 42 U.S.C. § 1983. See Johnson v. District of Columbia, 780 F.Supp.2d 62, 68 (D.D.C.2011) (describing this holding). Several months later, the district court, finding Dillard entitled to qualified immunity, granted him summary judgment on all claims against him in his personal capacity. As for the claims of Fourth Amendment Class members, the district court, relying on our recent decision in Bame v. Dillard, 637 F.3d 380 (D.C.Cir.2011), where we rejected similar Fourth Amendment claims brought by male detainees against the very same Marshal Dillard, see id. at 382, concluded that any Fourth Amendment rights Dillard might have violated were insufficiently clearly established at the time of the violation. Johnson, 780 F.Supp.2d at 73-75. As for the claims of Fifth Amendment Class members, the court, relying on Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), found no Equal Protection violation because nothing in the record indicated that Dillard intended to treat women differently from men. Johnson, at 780 F.Supp.2d at 79-81.
On appeal, class members press their claims against the District and Dillard, but only in his personal capacity. We review the district court’s grants of summary judgment de novo, viewing the evidence in the light most favorable to class members. See, e.g., Holcomb v. Powell, 433 F.3d 889, 895 (D.C.Cir.2006). We first consider whether class members may hold the District liable for Dillard’s conduct. Then, taking the Fourth and Fifth Amendment claims separately, we consider whether Dillard is entitled to qualified immunity.
II.
Members of both the Fourth and Fifth Amendment Classes seek to hold the District of Columbia liable under 42 U.S.C. § 1983 for the Superior Court Marshal’s *1199 conduct. As the Supreme Court explained in Monell v. Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), municipalities can be held liable under section 1983 only “when execution of a government’s policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury.” Id. at 694, 98 S.Ct. 2018. Conceding that no express District policy gave rise to their injuries, class members offer two theories — the “organic theory” and the “entrustment theory” — to explain how the District might nonetheless be liable under section 1983 for Dillard’s conduct.
Organic Theory
According to this theory, the Superior Court Marshal’s Office is “part of the organic government of the District of Columbia just as much as the Mayor, City Council and Superior Court.” Appellants’ Br. 44 (emphasis omitted). Claiming that the Superior Court is best understood as a state court, not a federal court, class members argue that the Superior Court Marshal derives his authority from “the inherent powers of the Superior Court.” Appellants’ Br. 50. Insofar as the Superi- or Court Marshal “handles pre-presentment arrestees ... as the policy maker for the District, by delegation from the policymaker, or pursuant to a widespread custom or practice in which the District of Columbia acquiesced,” Appellants’ Br. 44, class members urge us to find the District liable under section 1983 for any unconstitutional acts of the Marshal.
But we agree with the district court that the Superior Court Marshal is not a District official. Rather, the Superior Court Marshal “logically and expressly derives” his authority from federal law, specifically the Anti-Drug Abuse Act of 1988. See Johnson, 584 F.Supp.2d at 90. Pursuant to that Act, “[t]he President shall appoint, by and with the advice and consent of the Senate, a United States marshal for each judicial district of the United States and for the Superior Court of the District of Columbia.” 28 U.S.C. § 561(c). Like all other U.S. Marshals, the Superior Court Marshal “shall be an official of the Service and shall serve under the direction of the Director,” id., who “shall supervise and direct the United States Marshals Service in the performance of its duties.” 28 U.S.C. § 561(g). Each U.S. Marshal serves a four year term unless he resigns or is removed by the President. 28 U.S.C. § 561(d). Thus, Dillard, as Superior Court Marshal, was appointed and confirmed through a federal process, served as part of a federal agency under the direction of a federal official, and at all times could have been removed by the President. Under these circumstances, Dillard was hardly as much “part of the organic government of the District of Columbia ... as the May- or.” Appellants’ Br. 44 (emphasis omitted).
Acknowledging that the Superior Court Marshal qualifies as a federal official for purposes of appointment and removal, class members nonetheless argue that he derives no authority from federal law. But why would Congress create a U.S. Marshal’s office for a particular court and yet deny the holder of that office any federal authority? Class members have no answer, nor do we. Instead, class members find this bizarre result implicit in two provisions of the Anti-Drug Abuse Act. They first, point to section 566(a), which outlines the “primary role and mission of the United States Marshals Service.” 28 U.S.C. § 566(a). Under this section, U.S. Marshals “provide for the security and ... obey, execute, and enforce all orders of the United States District Courts, the United States Courts of Appeals, the Court of International Trade, and the United States Tax Court, as provided by law.” Id. As class members em *1200 phasize, this list does not include the Superior Court. Second, class members seize on the word “Federal” in section 566(e)(1), which authorizes the United States Marshals Service “to provide for the personal protection of Federal jurists, court officers, witnesses, and other threatened persons.” 28 U.S.C. § 566(e)(1). Class members argue that inclusion of the word “Federal” makes the entire subsection inapplicable to the Superior Court because, according to them, the Superior Court is equivalent to a state court. From these two provisions, class members conclude, “[T]he Act addresses the USMS’s role regarding the federal courts (as opposed to addressing at all the local D.C. Courts).” Appellants’ Br. 48.
Class members’ reliance on these provisions is misplaced. For one thing, section 566(a) lays out the “primary” — not “exclusive” — “role and mission of the United States Marshals Service.” Nothing in section 566(a) suggests that Congress intended to deprive the Superior Court Marshal of all federal authority within the court Congress designated that Marshal to serve. Moreover, given the dual federal/state status of Superior Court judges, Congress would have had to have used more specific language than “Federal jurist” to exclude them from section 566(e)(l)’s authorizations, especially given Congress’s decision to create the office of Superior Court Marshal. See United States v. Stewart, 104 F.3d 1377, 1391 (D.C.Cir.1997) (noting that D.C. Superior Court judges are “Article I ... judges, whom Congress intended to be analogous to state court judges” and holding that a federal statute “authorized [them] to act as federal committing magistrates”). In any event, the statutory scheme gives the District no power to exercise authority over or delegate authority to the Superior Court Marshal. Instead, the statute clearly says that the Superior Court Marshal serves at the “direction” of the United States Marshals Service. See 28 U.S.C. § 561(c). Thus, any authority Dillard exercised as Superior Court Marshal, whether delegated by the United States Marshals Service or provided directly by statute, was federal in nature.
Because Dillard, as Superior Court Marshal, was at all times a federal official acting under color of federal law, the organic theory provides no basis for finding the District liable under section 1983.
Entrustment Theory
Under this theory, the District exhibited deliberate indifference to Dillard’s unconstitutional conduct by continuing to send pre-presentment arrestees to the Superior Court cellblock despite knowing they would be strip searched there. Holding a municipality liable for its deliberate indifference requires more than “a showing of simple or even heightened negligence.” Board of County Commissioners v. Brown, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); see also City of Canton v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (requiring that plaintiffs show that the municipality’s policy was “so likely to result in the violation of constitutional rights,” and the need to change that policy “so obvious,” that policymakers “can reasonably be said to have been deliberately indifferent to the need”). To prevail on this theory, class members would have to show at least that the District had actual or constructive notice of unconstitutional strip search practices, as well as discretion to stop sending pre-presentment arrestees to the Superior Court Marshal. See Warren v. District of Columbia, 353 F.3d 36, 36-39 (D.C.Cir.2004) (“[F]aeed with actual or constructive knowledge that its agents will probably violate constitutional rights, the city may not adopt a policy of inaction.”).
*1201 We agree with the district court that even assuming that the District had notice of the strip search practices and that those practices were unconstitutional, the District lacked the discretion necessary for class members to prevail. Given that Dillard was at all times acting under color of federal law, see supra at 1198-1200, the District had no authority to prevent him from conducting strip searches of arres-tees upon their arrival at the Superior Court. Relying on two circuit court decisions, one by this Court and one by the Sixth Circuit, see Warren, 353 F.3d 36; Deaton v. Montgomery County, 989 F.2d 885 (6th Cir.1993), for the proposition that “[i]t does not matter if the transferor has no control over the facility in which it places its prisoners,” Appellants’ Br. 34, class members believe they can prevail even if Dillard was at all times a federal official acting under color of federal law. In each of the cited cases, however, the municipality had contracted to send its prisoners to a penal facility; even though the municipality exercised no direct control over policies and practices at the facility, it retained power to cancel the contract in the event of constitutional violations. See Warren, 353 F.3d at 37; Deaton, 989 F.2d at 885. Here, by contrast, nothing in the Record suggests that the District could have held presentment hearings somewhere other than the Superior Court. And although class members insist that the District had statutory authority to bypass the Superior Court Marshal and deliver pre-presentment arrestees directly to Superior Court judges, the statutory provisions class members rely on are ambiguous at best. Thus, the District’s failure to embrace class members’ statutory interpretation hardly demonstrates “deliberate indifference to the rights” of arrestees. See Canton, 489 U.S. at 388, 109 S.Ct. 1197. Class members also claim that the District would lack authority to issue citations or release arrestees on bond if it had to deliver all arrestees to the Superior Court Marshal. But the Marshal exercises federal authority over persons actually delivered to the Superior Court for presentment, not over everyone the Metropolitan Police Department detains. And while the District might issue citations for minor offenses such as traffic violations, arres-tees have a right to a presentment hearing. See D.C. Superior Ct. R.Crim. P. 5(a); see also County of Riverside v. McLaughlin, 500 U.S. 44, 53, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991) (“[W]arrantless arrests are permitted but persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause.” (citing Gerstein v. Pugh, 420 U.S. 103, 114, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975))).
Because neither the organic nor the en-trustment theory transforms the Superior Court Marshal into a District policymaker for purposes of section 1983, the District cannot be held liable for Dillard’s conduct. We thus turn to the question of Dillard’s liability.
III.
Relying on Bivens v. Six Unknown Named Agents, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), Fourth and Fifth Amendment Class members bring constitutional tort claims against Dillard in his personal capacity. In response, Dillard argues that he is entitled to qualified immunity. While carrying out their official duties, federal officials enjoy qualified immunity from damages suits in order to “shield them from undue interference with their duties and from potentially disabling threats of liability.” Harlow v. Fitzgerald, 457 U.S. 800, 807, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). To overcome a claim of qualified immunity, plaintiffs must show both that an official “violated a constitutional right” and that “the right *1202 was clearly established” at the time of the violation. Saucier v. Katz, 533 U.S. 194, 200-01, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The Supreme Court has made clear that courts may address the two stages of the qualified immunity analysis in either order. See Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009) (“The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.”). Grateful for that flexibility, we address the claims of the two classes in turn.
The Fourth Amendment Class
Fourth Amendment Class members urge us to find that “the Fourth Amendment prohibits blanket strip searches of [detainees] arrested on minor charges,” at least where no detainees were held in the general population and “there [is] no significant contraband problem.” Appellants’ Br. 17, 26-28. Like the district court, however, we have no need to reach the merits of this contested constitutional question in order to find Dillard entitled to qualified immunity. Under our decision in Bame v. Dillard, 637 F.3d 380, 384 (D.C.Cir.2011), any Fourth Amendment right Dillard might have violated was insufficiently clearly established at the time. See Pearson, 555 U.S. at 237, 129 S.Ct. 808 (approving of addressing only the second stage of the qualified immunity analysis where “it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right”).
In Bame, this Court, addressing only the “clearly established” stage of the qualified immunity analysis, found Dillard entitled to qualified immunity for Fourth Amendment claims brought by male plaintiffs — claims otherwise virtually indistinguishable from those brought by Fourth Amendment Class members in this case. Like class members, Bame plaintiffs were arrested for non-drug, non-violent offenses, held temporarily at “various police holding facilities,” brought to the Superior Court “to await disposition of the charges against them,” “strip searched upon arrival” at the Superior Court eellblock, placed together in holding cells, and released directly from the Superior Court eellblock without spending any time in general jail populations. Bame, 637 F.3d at 382-83. The strip searches at issue in Bame occurred in September 2002, near the end of the Fourth Amendment Class period. Id. at 383.
According to Bame plaintiffs, by the time Dillard had implemented the challenged policies, the circuits had reached a “consensus” that policies similar to Dillard’s violated the Fourth Amendment. See Bame, 637 F.3d at 385. But in Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), the Supreme Court rejected a Fourth Amendment challenge to a penal strip search policy and instructed courts evaluating such challenges to “consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.” Id. at 559, 99 S.Ct. 1861. In Bame, we held that Dillard, balancing these factors, could reasonably have concluded that his strip search policy was constitutional. Bame, 637 F.3d at 386 (“Clearly, it was reasonable for Dillard, like the courts of appeal that reached the issue after 2002, to believe strip searching all male arrestees was consistent with the law as set forth in Bell [and United States Marshals Service policy statements].”). Although Bame plaintiffs, like class members here, emphasized that they were charged with minor non-drug, non-violent offenses, we noted that “[t]he policy that *1203 the Court categorically upheld in Bell applied to all inmates, including those charged with lesser offenses and even those charged with no wrongdoing at all who were being held as witnesses in protective custody.” Id. at 387 (internal quotation marks omitted). Although Bame plaintiffs, like class members here, emphasized the short duration of their stay at the Superior Court eellbloek, we responded that “[c]ontrary to the plaintiffs’ contention, nothing whatsoever in Bell suggests its holding is limited to overnight detention facilities.” Id. Although Bame plaintiffs, like class members here, insisted that they never came into contact with detainees housed in general jail populations, we emphasized that “Bell [nowhere] mentioned], let alone reified] upon, [intermingling with other detainees] as a reason for upholding the strip searches. In any event, arres-tees held at the Superior Court were in fact commingled with other arrestees in holding cells; no one suggests each arres-tee was put in a separate cell.” Id. And finally, although Bame plaintiffs, like class members here, challenged the sufficiency of Dillard’s contraband justification, we concluded that “the record here substantiates Dillard’s point that the Superior Court had a persistent problem -with contraband being smuggled into the eellbloek, the very reason for strip searches.” Id.
Fourth Amendment Class members attempt to distinguish Bame in three ways. First, they point to a consent agreement— the so-called Morgan Order — in which the District promised “not [to] conduct strip or squat searches of female police cases housed at the District of Columbia Detention Facility in the absence of a reasonable suspicion.” See Morgan v. Barry, 596 F.Supp. 897, 898 (D.D.C.1984) (explaining the agreement) (internal quotation marks omitted). According to class members, this agreement, which protects only female arrestees and thus was not at issue in Bame, put Dillard on notice that strip searching class members would violate their Fourth Amendment rights. In the Morgan Order, however, the District never concedes that any particular strip search policies violate the Fourth Amendment. Moreover, the Morgan Order binds only the District and its agents at the District of Columbia Detention Facility, not Dillard, a federal official in charge of the Superior Court eellbloek.
Second, Fourth Amendment Class members claim that in Bame we addressed the constitutionality of strip searches without “individualized, reasonable suspicion” whereas they focus on “the right of arres-tees, not entering general population, to be free from strip searches prior to presentment to the court.” Appellants’ Br. 70. Contrary to class members’ assertion, however, in Bame we expressly rejected the notion that Bell limited penal strip searches to overnight, general population facilities. See Bame, 637 F.3d at 387.
Third, Fourth Amendment Class members argue that “any contraband problem that may have existed in the Superior Court eellbloek had evaporated by 1999 or 2000,” Appellants’ Br. 29, and that the Superior Court Marshal’s failure to strip search all men belies the asserted effectiveness of strip searches. But in Bame we evaluated similar evidence of contraband and found that the Superior Court suffered from a “persistent problem with contraband” as late as 2002. 637 F.3d at 387. In any event, as the Supreme Court observed in Bell, a dearth of recovered contraband “may be more a testament to the effectiveness of this search technique as a deterrent.” Bell, 441 U.S. at 559, 99 S.Ct. 1861. And even if deputy marshals did not strip search all men, that hardly compels the conclusion that Dillard understood strip searches to be generally ineffective.
*1204 Thus, like the district court, we see no daylight between the claims we rejected in Bame and the ones Fourth Amendment Class members press here. See Johnson, 780 F.Supp.2d at 74-75 (“[T]he claims addressed in Bame and the instant case cannot be distinguished in any meaningful way.”)- Although class members obviously disagree with Bame, that decision is binding on us. As a result, Dillard is entitled to qualified immunity because the Fourth Amendment right he is accused of violating was not clearly established at the time of any violation.
The Fifth Amendment Class
Fifth Amendment Class members maintain that the strip search gender disparity violated the Fifth Amendment’s equal protection guarantee. We resolve these claims, unlike the claims of the Fourth Amendment class, at the first stage of the qualified immunity analysis by examining whether Dillard violated class members’ Fifth Amendment rights.
The parties agree that Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), controls this issue. In Iqbal, the Supreme Court addressed “[t]he factors necessary to establish a Bivens violation ... [w]here the claim is invidious discrimination in contravention of the ... Fifth Amendment ].” Id. at 676, 129 S.Ct. 1937. Because “purposeful discrimination requires more than ‘intent as volition or intent as awareness of consequences,’ ” id. (quoting Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979)), supervisors face no liability for mere “knowledge and acquiescence in their subordinates’ use of discriminatory criteria,” id. at 677, 129 S.Ct. 1937 (internal quotation marks omitted). Instead, under Iqbal, plaintiffs must show that supervisors acted with discriminatory purpose. Id. (“[Pjurpose rather than knowledge is required.... ”). “[T]he plaintiff must plausibly plead and eventually prove not only that the official’s subordinates violated the Constitution, but that the official by virtue of his own conduct and state of mind did so as well.” Dodds v. Richardson, 614 F.3d 1185, 1198 (10th Cir.2010).
Acknowledging that they “must prove Dillard intended to discriminate against women arrestees,” Fifth Amendment Class members argue that Dillard “intended a policy, formal or informal, of women-only strip searches.” Appellants’ Br. 52. For his part, Dillard insists that his policy throughout the class period required “every prisoner” — both male and female — to go through the strip search process upon arrival at the Superior Court eellbloek. See, e.g., Dillard Bame Deposition 89:6-98:3. Although class members point to some evidence from which we might infer that Dillard knew deputies were implementing his gender neutral policy in a gender imbalanced manner, plenty of other evidence suggests that Dillard was largely missing in action throughout the class period. But even assuming class members could show that Dillard knew what was going on at the eellbloek, they have pointed to no evidence from which we could infer that Dillard himself intended to treat women differently from men. For instance, class members cite a former deputy marshal’s testimony that the practice in the eellbloek was to strip search all female detainees but not all males because of certain “differences in the anatomy.” Shealey Deposition 158:8-162:22. But that same former deputy went on to testify that any disparate treatment did not reflect Dillard’s policy: “[Supervisors] put [no] emphasis on females. They basically [made] sure that everybody was thoroughly searched coming into that cell block, and that we had policies and procedures in place to conduct those searches to make sure that no contraband came into those *1205 cell blocks.” Shealey Deposition 164:7-13. This is hardly an isolated example. Indeed, class members cite no testimony by any subordinate indicating that the gender disparity resulted from Dillard’s instruction or intention.
Class members also claim that the United States Marshals Service admitted in interrogatory responses in two other cases that despite Dillard’s assertions “the ‘more customized’ policy was to stop strip searching males and to continue strip searching females.” Appellants’ Br. 60. But these responses, both written by the same deputy marshal who testified that supervisors “put [no] emphasis on females,” describe the “practice” among deputies at the cell-block, not Dillard’s policies. Helton Interrogatory Response 4; Clifton Interrogatory Response 5.
In a final effort to demonstrate discriminatory pui'pose, class members ask us to grant them an adverse inference from missing evidence. Specifically, they claim that although Dillard prepared a written policy statement during the class period laying out Superior Court operating procedures, he failed to produce a copy during discovery. “Because defendant never acknowledged or produced Dillard’s written search policy,” class members assert, “plaintiffs are entitled to an adverse inference that the policy was to strip search all female prisoners but not males.” Appellants’ Br. 58. Dillard, however, has not only consistently denied the existence of any undisclosed policy statement but has also maintained that he left behind all official documents at the end of his term as Superior Court Marshal because “they were government property.” Dillard Br. 65. Even assuming an undisclosed policy statement once existed, an adverse inference from missing evidence is appropriate only “if it is peculiarly within the power of one party to produce the evidence.... The party complaining of the missing evidence bears the burden of demonstrating that it is peculiarly in the opposing party’s control.” Czekalski v. LaHood, 589 F.3d 449, 455 (D.C.Cir.2009) (internal quotation marks omitted). Since class members nowhere dispute Dillard’s explanation for why he left behind all official documents, they have failed to show that the policy statement was ever “peculiarly within [Dillard’s] power ... to produce” or “peculiarly in [Dillard’s] control.” Id.
We thus agree with the district court that “there is no circumstantial or direct evidence that Marshal Dillard purposefully directed that women and men be searched differently at the Superior Court cell-block.” Johnson, 780 F.Supp.2d at 81. Under Iqbal, then, Dillard is entitled to qualified immunity because class members have failed to show that he violated their Fifth Amendment rights.
IV.
For the foregoing reasons, we affirm.

So ordered.