# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed: August 1, 2014

No. 11-5115

DIANNA JOHNSON, ET AL.,
APPELLEES

RUBBIYA MUHAMMED, ET AL.,
APPELLANTS

v.

GOVERNMENT OF THE DISTRICT OF COLUMBIA AND TODD
DILLARD, INDIVIDUALLY AND OFFICIALLY, UNITED STATES
MARSHAL, D.C. SUPERIOR COURT,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:02-cv-02364)

———

On Petition for Rehearing En Banc

———

Before: GARLAND, *Chief Judge,* HENDERSON, ROGERS*,
TATEL, BROWN, GRIFFITH, KAVANAUGH, SRINIVASAN,
MILLETT*, PILLARD*, AND WILKINS*, *Circuit Judges.*

## **O R D E R**

Appellants' petition for rehearing en banc and the responses thereto were circulated to the full court, and a vote was requested. Thereafter, a majority of the judges eligible to participate did not vote in favor of the petition. Upon consideration of the foregoing, it is

**ORDERED** that the petition be denied.

### **Per Curiam**

**FOR THE COURT:**
Mark J. Langer, Clerk

BY: /s/

Jennifer M. Clark
Deputy Clerk

*Circuit Judges Millett and Wilkins did not participate in this matter.

*Circuit Judge Rogers would grant the petition for rehearing en banc.

*A statement by Circuit Judge Pillard, concurring in the denial of rehearing en banc, is attached.

*A statement by Circuit Judge Rogers, dissenting from the denial of rehearing en banc, is attached.

PILLARD, *Circuit Judge*, concurring in the denial of rehearing *en banc*: This case was brought by a plaintiff class of approximately 1,600 women arrested between 1999 and 2003 in the District of Columbia for non-violent, non-drug minor offenses (such as traffic stops) who were held briefly at the D.C. Superior Court cellblock. Each of these women was subject to a visual body-cavity strip search pending her appearance before a judge or magistrate. The plaintiffs seek rehearing *en banc* of the panel decision dismissing their Fourth Amendment *Bivens* claims. Those claims challenge the practice of the former U.S. Marshal for the D.C. Superior Court of conducting pre-arraignment body-cavity searches of women, but not men, without any warrant or even individualized suspicion that the women were carrying contraband in their body cavities. Our court, in *Bame v. Dillard*, 637 F.3d 380 (D.C. Cir. 2011), and in this case following *Bame*, held that any constitutional rights the Marshal may have violated were not clearly established, entitling him to qualified immunity. Plaintiffs challenge the panel decision as erroneous and in conflict with *Bell v. Wolfish*, 441 U.S. 520 (1979), and *Florence v. Board of Chosen Freeholders*, 132 S. Ct. 1510 (2012), and as contrary to the consensus of every other circuit to have addressed the issue of the constitutionality of the type of suspicionless body-cavity searches in this case.

Despite the importance of the constitutional question, I concur in the decision to deny *en banc* review. This is a suit for damages, but prospective factors also enter our consideration whether to grant review. The U.S. Marshal for the D.C. Superior Court has ceased the challenged practice of routine, suspicionless visual body-cavity searches of female arrestees, thereby limiting the practical importance of the panel's holding. *See* Fed. R. App. P. 35(a). In following this court's prior decision in *Bame*, 637 F.3d 380, as it was bound to do, the panel decision—insofar as it goes—replicates a context-specific legal error limited to the qualified immunity

issue, which has not otherwise been repeated in this Circuit. I write briefly to explain why I believe that the decision in *Bame*, and thus *Johnson*, is wrong and should not be taken to suggest that qualified immunity would be available were the Superior Court Marshal to resurrect the challenged practice.

**I.**

The visual body-cavity search policy and practice challenged in both *Bame* and this case has been abandoned by the Superior Court Marshal, who agreed under pressure of litigation to conform his conduct to the U.S. Marshals Service policy, *see* Oral Arg. Rec. at 57:26-59:60, *Johnson v. District of Columbia*, 734 F.3d 1194 (D.C. Cir. 2013) (No. 11-5115), which requires reasonable suspicion before any strip search.[1] Other incarcerating authorities in our Circuit also require reasonable suspicion for body-cavity searches. For example, the Bureau of Prisons forbids suspicionless visual body-cavity searches of persons arrested for misdemeanors or held in civil contempt, and requires that such arrestees be held separately from the general prison population. *See Florence*, 132 S. Ct. at 1524 (Alito, J., concurring) (citing Br. for the United States as Amicus Curiae Supporting Respondents at 30, *Florence*, 132 S. Ct. 1510 (No. 10-945), 2011 WL 3821404). Both

---

[1] *See* Br. for Federal Appellee at 59 n.17, *Johnson*, 734 F.3d 1194 (No. 11-5115), 2013 WL 621948; U.S. Marshals Serv., Policy Directives – Prisoner Operations, Prisoner Custody – Body Searches § 9.1(E)(3) (2010), http://www.usmarshals.gov/foia/ directives/prisoner_ops/body_searches.pdf ("Strip searches on prisoners in custody are authorized when there is reasonable suspicion that the prisoner may be (a) carrying contraband and/or weapons, or (b) considered to be a security, escape, and/or suicide risk."); U.S. Marshals Serv., Policy Directive No. 99-25 (1999) (same).

Immigration and Customs Enforcement and the Bureau of Indian Affairs also require reasonable suspicion before visual body-cavity searches.[2] The restraint codified in those policies makes good sense. Strip searches are a particularly severe and degrading form of search. They are imposed at grave human cost, even when they are constitutionally justified.

The searches at issue in this case, although sometimes referred to by the shorthand "strip search," were of a particularly invasive type, involving close visual scrutiny of arrestees' body cavities. *Johnson*, 734 F.3d at 1197. The term "strip search" can be an umbrella term, used in judicial decisions and elsewhere to refer to various types of searches of varying intrusiveness. *See Florence*, 132 S. Ct. at 1515 (noting that "[t]he term is imprecise"). This case involves practices far more intrusive than naked shower "strip searches" of incoming groups of inmates, in which guards stand several yards back to supervise lice shampoo application and check for wounds or gang tattoos before convicts enter prison. *See generally* Tr. of Oral Arg. at 16:13-17:3, *Florence*, 132 S. Ct. 1510 (No. 10-945) (counsel for Florence) (distinguishing such practices as more readily justified). The policy challenged here, in contrast, required plaintiffs to remove their clothing, squat to expose their vaginas, and cough in order to dislodge anything they might be hiding inside while officials, looking for potential

---

[2] *See* Immigration and Customs Enforcement (ICE), Performance-Based National Detention Standards 2011, at § 2.10, at 142 (2013), *available at* http://www.ice.gov/detention-standards/2011; Office of Justice Servs., Bureau of Indian Affairs, BIA Adult Detention Facility Guidelines (Draft), at 22-23 (2010), *available at* http://www.niccsa.org/downloads/TLOA/BIAADULTDETENTIO NFACILITYGUIDELINES.pdf.

contraband, individually scrutinized plaintiffs' genitalia at approximately arms' length. *See Johnson*, 734 F.3d at 1197.

Official policy demanding that a person strip naked and crouch or bend to expose her vagina or anus for prison personnel's close inspection is a humiliating invasion that offends bodily autonomy and may cause lasting psychological harm. *See Florence*, 132 S. Ct. at 1524 (Alito, J., concurring) ("Undergoing such an inspection is undoubtedly humiliating and deeply offensive to many . . . ."); *Bell*, 441 U.S. at 558 ("Admittedly, this practice instinctively gives us the most pause."); *id.* at 563 (Powell, J., concurring in part and dissenting in part) ("In view of the serious intrusion on one's privacy occasioned by [a body-cavity search], I think at least some level of cause, such as a reasonable suspicion, should be required to justify the anal and genital searches described in this case."). The Seventh Circuit has described such searches as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission," explaining that "few exercises of authority by the state . . . intrude on the citizen's privacy and dignity as severely as the visual anal and genital searches practiced here." *Mary Beth G. v. City of Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (citation and quotation marks omitted); *see generally* Br. for Psychiatrists as Amici Curiae in Support of Petitioner, *Florence*, 132 S. Ct. 1510 (No. 10-945), 2011 WL 2593462 (describing the severe, often lasting psychological harm to individuals' sense of self from mandated strip searches of body parts that, from an early age, we most privately and consistently conceal from strangers). It may be hoped, therefore, that the policy decisions of District of Columbia and federal officials have put an end to the kind of practice challenged in this case without further litigation.

5

## II.

Another factor that counsels against *en banc* review is that neither *Johnson* nor *Bame* made an error of constitutional dimension; the decision in each case rests only on the law's putative lack of clarity to dismiss the claims as barred by qualified immunity. Sometimes constitutional avoidance is the preferable path in these circumstances. *See Pearson v. Callahan*, 555 U.S. 223, 236-39 (2009) (discussing factors that may make litigation over the constitutional question unnecessary or ill-advised). The Supreme Court, however, recognizes a special exception to the constitutional avoidance rule for qualified immunity cases. That exception assures that development of constitutional precedent is not delayed in doctrinal areas where qualified immunity is frequently dispositive. *See Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014) (addressing the constitutional merits first to aid in "'develop[ing] constitutional precedent' in an area that courts typically consider in cases in which the defendant asserts a qualified immunity defense" (brackets in original) (quoting *Pearson*, 555 U.S. at 236)). The Court has emphasized that addressing the merits of the constitutional claim "is often beneficial," even in cases decided on the ground that the law is not clearly established. *Pearson*, 555 U.S. at 236; *see also Camreta v. Greene*, 131 S. Ct. 2020, 2032 (2011). This court accordingly has discretion to decide which of the two prongs in a qualified immunity case should be addressed first: whether the asserted constitutional right exists in the context of the particular case, or whether any such right was sufficiently clearly established at the time of the challenged conduct to overcome qualified immunity. The panels' decisions in *Bame* and this case to avoid the merits of the Fourth Amendment question and decide only on grounds of legal unclarity limits the impact of the panel decision, and so further diminishes the need for rehearing *en banc*.

But the choice to avoid the merits question in *Bame*, followed here, was not without cost. It took us another step down the very path the Supreme Court has warned against, by "fail[ing] to give guidance to officials about how to comply with legal requirements." *Camreta*, 131 S. Ct. at 2031. Two panels of our court have held that no clearly established law requires even individualized suspicion before imposing visual body-cavity searches on arrestees held temporarily in holding cells outside the arraignment courtrooms at the D.C. Superior Court. *Johnson*, 734 F.3d at 1204 (citing *Bame*, 637 F.3d 380). Given the Superior Court Marshal's persistence in using these degrading searches, a decision in *Bame* on the constitutional merits would have provided useful guidance. The Superior Court Marshal imposed a blanket, suspicionless strip-search policy despite the U.S. Marshals Service policy's reasonable suspicion requirement, *see supra* note 1, which was binding on him as a federal official. The Marshal instead mistakenly and unlawfully, going back to at least the early 1980s, conducted blanket strip searches in the face of repeated constitutional challenges.[3] Avoidance of litigation risk—rather than any determination that the policy was either inappropriately intrusive or unconstitutional—appears to have motivated the Superior Court Marshal's abandonment of the strip-search policy challenged here. *See, e.g.*, Oral Arg. Rec. at 57:26-59:50, *Johnson*, 734 F.3d 1194 (No. 11-5115). By repeatedly bypassing the merits of the constitutional

---

[3] *Bame v. Dillard*, 647 F. Supp. 2d 43, 51-52 (D.D.C. 2009) (explaining Marshal Dillard's practice of routinely performing "strip searches of all detained arrestees during the entire thirteen years he was Marshal"); *see, e.g., Morgan v. Barry*, 596 F. Supp. 897, 899 (D.D.C. 1984) (referring to consent order requiring reasonable suspicion for visual body-cavity searches).

challenge, the panel decisions fail to promote law-abiding behavior and could be construed to countenance violations. *See Camreta*, 131 S. Ct. at 2031. Accordingly, because a decision based on qualified immunity alone provides equivocal constraint and because, in my view, the Marshal's policy violated plaintiffs' Fourth Amendment rights, I believe the *Bame* panel should, at a minimum, have announced the constitutional rule before any conclusion that the prohibition was not clearly established. Such a decision would have erected a firmer barrier against the reinstatement of these search practices.

Moreover, in my view, the challenged visual body-cavity searches were clearly unconstitutional at the time they were conducted, and remain so today. The Fourth Amendment protects the people from "unreasonable searches," shielding our bodily privacy from warrantless searches with only "a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967); *see Riley v. California*, Nos. 13-132, 13-212, 2014 WL 2864483, at *6 (U.S. June 25, 2014) ("In the absence of a warrant, a search is reasonable only if it falls within a specific exception to the warrant requirement."). *Bame* relied on the exception established in *Bell*, which the Court affirmed in *Florence*, but no circuit has ever applied those decisions' approval of blanket search policies of persons entering general prison populations to detainees like plaintiffs here, who were held apart from any general population of prisoners.

The Supreme Court in *Bell* sustained a policy of strip searching everyone in a mixed correctional facility population immediately after voluntary, loosely monitored contact visits. *See* 441 U.S. at 524-26, 559 & n.40. The Metropolitan Correctional Center in *Bell*—a "unique place fraught with serious security dangers"—jointly housed pretrial detainees

with convicted prisoners. *Id*. at 524, 559. The Court's most recent approval of strip-search policies in *Florence*, in the context of searching an arrestee entering general prison populations at two large facilities, rejected a proposed exception for minor, non-violent offenders from otherwise blanket policies requiring visual body-cavity searches. *Florence*, 132 S. Ct. at 1520. But eight justices agreed that the Court was not approving the constitutionality of strip searching arrestees held apart from the general prison population.[4] Thus, *Bell* did not reach the distinct question of the constitutionality of searching arrestees in this particularly

---

[4] *See Florence*, 132 S. Ct. at 1522-23 (plurality opinion) (Kennedy, J., joined by Roberts, C.J., Scalia & Alito, JJ.) ("This case does not require the Court to rule on the types of searches that would be reasonable in instances where, for example, a detainee will be held without assignment to the general jail population and without substantial contact with other detainees."); *id.* at 1523 (Roberts, C.J., concurring) (reiterating that, "[a]s with Justice Alito, . . . it is important for me that the Court does not foreclose the possibility of an exception to the rule it announces," and emphasizing that Florence was detained pursuant to an arrest warrant and that "there was apparently no alternative . . . to holding him in the general jail population"); *id.* at 1524 (Alito, J., concurring) ("I join the opinion of the Court but emphasize the limits of today's holding. The Court holds that jail administrators may require all arrestees *who are committed to the general population of a jail* to undergo visual strip searches not involving physical contact by corrections officers." (emphasis in original)); *see also id.* at 1532 (Breyer, J., joined by Ginsburg, Sotomayor, & Kagan, JJ., dissenting) ("[I]t remains open for the Court to consider whether it would be reasonable to admit an arrestee for a minor offense to the general jail population, and to subject her to the humiliation of a strip search, prior to any review by a judicial officer." (quotation marks omitted)).

intrusive manner when they are held apart from the general population, and *Florence* is expressly limited on that point.

Meanwhile, in the decades after *Bell*, ten federal courts of appeals held that persons arrested for minor, non-drug, non-violent offenses who were not introduced into the general prison population could not be subjected to invasive strip searches without reasonable suspicion. *See Roberts v. Rhode Island*, 239 F.3d 107, 112-13 (1st Cir. 2001); *Weber v. Dell*, 804 F.2d 796, 802 (2d Cir. 1986); *Logan v. Shealy*, 660 F.2d 1007, 1013 (4th Cir. 1981); *Stewart v. Lubbock Cty. Tex.*, 767 F.2d 153, 156-57 (5th Cir. 1985); *Masters v. Crouch*, 872 F.2d 1248, 1255 (6th Cir. 1989);[5] *Mary Beth G.*, 723 F.2d at 1272-73; *Jones v. Edwards*, 770 F.2d 739, 742 (8th Cir. 1985); *Giles v. Ackerman*, 746 F.2d 614, 616-18 (9th Cir. 1984) (per curiam);[6] *Hill v. Bogans*, 735 F.2d 391, 394 (10th Cir. 1984); *Wilson v. Jones*, 251 F.3d 1340, 1343 (11th Cir. 2001).[7] *Florence* abrogated some of those decisions to the extent they required that persons arrested on minor offenses

---

[5] *But see T.S. v. Doe*, 742 F.3d 632, 636-37 (6th Cir. 2014) (abrogating *Masters* in light of *Florence*). *T.S. v. Doe* does not, however, address *Florence*'s express reservation of decision on the ground relied on here: that plaintiffs were not introduced into the general prison population with its attendant heightened security concerns.

[6] *But cf. Bull v. City and Cnty. of San Francisco*, 595 F.3d 964, 977 (9th Cir. 2010) (en banc) (abrogating *Giles*, but only to the extent that detainees were to enter the general prison population).

[7] *But cf. Powell v. Barrett*, 541 F.3d 1298, 1307, 1314 (11th Cir. 2008) (en banc) (abrogating *Wilson* in context of detainees being booked into the general population of the detention facility).

be excepted from blanket strip searches even when they were entering a general prison population; *Florence* did not, however, disturb recognized Fourth Amendment restrictions against such searches of persons held apart from the general prison population.

Notably, no circuit has sustained a blanket policy of strip searching arrestees who are *not* introduced into a general prison population.  The circuit decisions cited in Dillard's brief that sustained strip searches are no exception.  *See Bull v. City & County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (en banc); *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (en banc).  *Powell* involved detainees being booked into the general population of the detention facility, 541 F.3d at 1302; it provides no authority for suspicionless strip searches of the Superior Court arrestees in this case.  And *Bull* emphasized that its approval of suspicionless strip searches "applies only to detainees classified to enter the general corrections facility population." 595 F.3d at 981 n.17.  There is simply no case from any circuit authorizing what the Marshal did here.  It thus remains clear under the Fourth Amendment that the searches in both *Bame* and *Johnson* of persons not held in the general population of any prison cannot be justified without at least individualized suspicion.

Marshal Dillard nonetheless contends that *Florence* applies here despite the Supreme Court's limitation of its holding to persons intermingled with the general prison population, on the ground that the plaintiffs "were in what was viewed in Superior Court as general population."  Todd Dillard's Opp'n to Rehearing and Rehearing *En Banc* at 7, *Johnson*, 734 F.3d 1194 (No. 11-5115).  It was, however, undisputed that the class members in this case were not held in a general prison population, but were released "without spending any time in general jail populations." *Johnson*, 734

F.3d at 1202 (citing *Bame*, 637 F.3d at 382-83). The District Court specifically distinguished the factual scenarios in *Florence*, *Bull*, and *Powell* as involving prisoners who "were about to be entered into, or co-mingled with, a general jail or detention facility population" whereas this case involved Superior Court arrestees, most of whom "were only held temporarily at the D.C. Superior Court and then either released from the courtroom the same day or transferred to the D.C. Jail." *Johnson v. District of Columbia*, 780 F. Supp. 2d 62, 74 (D.D.C. 2011); *see also Bame v. Dillard*, 647 F. Supp. 2d 43, 49 (D.D.C. 2009) (noting that the plaintiffs "were placed in holding cells again, exclusively with one another. They were not commingled with the general inmate population."); *id.* at 53 (plaintiffs were "held together at all times and not commingled with the general inmate population"). Indeed, as we recognized, "[r]oughly eighty percent of female arrestees were released following [arraignment] hearings" and thus never were sent to the general population at the D.C. Jail. *Johnson*, 734 F.3d at 1197. That fact clearly and materially distinguishes *Bame* and this case from those that Dillard cites.

Our constitutional protections against visual body-cavity searches, though narrow, are far from insignificant. When we bear in mind the breadth of the government's constitutional latitude to search people in the interests of safety, the importance of those limits the Constitution does impose is even more vivid. The Fourth Amendment permits a warrantless arrest whenever an officer has probable cause to believe a person has committed a criminal offense, no matter how minor, *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001), and deference to prison security permits blanket visual body-cavity strip searches of detainees placed in the general prison population, *Florence*, 132 S. Ct. at 1522-23. But the government's power to search our bodies is not

unlimited. Security concerns regarding arrestees held at the Superior Court cellblock while they wait to appear in court, all of whom are innocent until proven guilty, cannot be equated with the challenges of managing a prison population of convicted prisoners or persons awaiting trial but judicially determined unsafe for release on bail. Searching body cavities of presumptively non-dangerous arrestees to prevent them from carrying contraband to a presumptively dangerous general jail population is a security rationale that wanes when such arrestees are—as they reasonably should be—segregated from other prisoners. *Bell* and *Florence*'s approval of strip searches in the former context does not justify their approval in the latter context, as every circuit to address the issue, other than ours, has recognized.

## III.

In any event, the panel's decision that the law was unclear should not be understood to leave the door open to future suspicionless body-cavity searches at the Superior Court. The panel in this case was bound by *Bame*'s qualified immunity analysis. *Johnson*, 734 F.3d at 1204 (commenting that there was "no daylight between the claims we rejected in *Bame* and the ones Fourth Amendment Class members press here"). Thus, the error of *Bame*'s application of qualified immunity (followed by the panel in this case) warrants explication.

In general terms, *Bame* correctly stated that law enforcement officials are entitled to rely on Supreme Court precedent, so that "when a precedent of the Supreme Court supports the lawfulness" of an official's conduct, "a consensus among the courts of appeals" to the contrary cannot vitiate qualified immunity. 637 F.3d at 386. *Bame*—and hence *Johnson*—held that the challenged policy was not

clearly unconstitutional because the Supreme Court had approved a blanket strip-search policy in *Bell*. *Bame* erred, however, in reading the Supreme Court's decision in *Bell* to "support[] the lawfulness" of the Marshal's visual body-cavity searches. *See id*. Whether an official has violated law that is "clearly established," and so renders qualified immunity unavailable, "depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The qualified immunity inquiry, the Supreme Court has emphasized, "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). What matters is applicable precedent governing the right "in a more particularized, and hence more relevant, sense." *Anderson*, 483 U.S. at 640. Just as a plaintiff cannot assert that a right is clearly established by framing his claim at a very high level of generality ("the Fourth Amendment is clearly established"), so, too, an official cannot sidestep a consensus of factually particular and thus more closely analogous circuit cases ("the Fourth Amendment bars blanket suspicionless strip searches of arrestees held apart from the general prison population") by adverting to a Supreme Court case involving a factually different problem, and simply redescribing it at a higher level of generality ("blanket strip searches of detainees are constitutional"). Correct application of *Bell*, the Court's more recent decision in *Florence*, and the persuasive and unanimous circuit authority is contrary to *Bame*'s qualified immunity analysis. *See supra* Part II.

*Bell* established the general balancing test that courts must apply when considering the constitutionality of a strip search, 441 U.S. at 559, but neither *Bell* nor *Florence* authorizes blanket strip-search policies in every detention context. The critical difference between the policies sustained

in *Bell* and *Florence* and the policy challenged in *Bame* and this case is that, here, the plaintiffs were not entering any general prison population. The limited exceptions charted by *Bell* and *Florence* to the Fourth Amendment's requirement of individualized justification for searches, in addition to the holdings of the circuits that applied the *Bell* balancing test to invalidate blanket, suspicionless strip searches of arrestees not held in general prison populations, should have more than sufficed to form "a consensus of cases of persuasive authority" vitiating qualified immunity here. *See Wilson v. Layne*, 526 U.S. 603, 617 (1999).

In the abstract, however, *Johnson*'s articulation of the qualified immunity standard is consistent with Supreme Court and this court's precedent. *Johnson*, 734 F.3d at 1201-02; *see also Bame*, 637 F.3d at 384 (stating that, to determine qualified immunity, "we look to cases from the Supreme Court and this court, as well as to cases from other courts exhibiting a consensus view—if there is one" (citation and quotation marks omitted)). Because this court's qualified immunity error was in application rather than articulation of the standard, and because the panel did not uphold as constitutional the invasive—and in my view unconstitutional—practices at issue here, I join in concluding that the panel decision does not present the extraordinary circumstances warranting *en banc* review.

ROGERS, *Circuit Judge*, dissenting from the denial of rehearing *en banc*: The Supreme Court has emphasized that the "regular policy" of constitutional avoidance in aid of judicial restraint "sometimes does not fit the qualified immunity situation because it threatens to leave standards of official conduct permanently in limbo." *Camreta v. Greene*, 131 S. Ct. 2020, 2031 (2011). This case illustrates that concern. All ten of the circuit courts of appeal to address the Fourth Amendment issue have held for over a decade that strip searching individuals arrested for non-violent, non-drug offenses who have not yet appeared before a judicial officer and will not enter into the general detained population is unconstitutional in the absence of reasonable suspicion they are carrying contraband. *See Bame, et al. v. Dillard*, 637 F.3d 380, 391–92, 395 (D.C. Cir. 2011) (Rogers, J., dissenting) (citing cases). So have the federal district court here, *see Doe v. Berberich*, 704 F. Supp. 269, 271–72 (D.D.C. 1988) (*Bivens* claim, citing Fifth, Seventh, and Ninth Circuits); *Helton v. United States*, 191 F. Supp. 2d 179, 185 (D.D.C. 2002) (tort claim against U.S. Marshal, citing ten federal circuit courts of appeal); *see also Morgan v. Barry*, 596 F. Supp. 897, 899 (D.D.C. 1984) (consent order), and, more recently, the D.C. Court of Appeals, the District of Columbia's highest court, *see United States v. Scott*, 987 A.2d 1180, 1196–97 (D.C. 2010). (The Third Circuit has not reached the issue; the Federal Circuit is unlikely to have the occasion to do so.)

Yet the legality of the practice remains uncertain in this Circuit because in two sequential class action lawsuits this court has applied the canon of constitutional avoidance and disposed of the appeals on qualified immunity grounds. *See Johnson, et al. v. Dist. of Columbia & Dillard*, 734 F.3d 1194, 1204 (D.C. Cir. 2013); *id.* at 1205–07 (Rogers, J. concurring in part and concurring in the judgment (hereinafter "Rogers, J.")); *Bame,* 637 F.3d at 386; *id.* at 388 (Rogers, J., dissenting). This uncertainty exists even though at the time of the challenged strip searches the United States Marshal for the D.C. Superior Court

was not free to ignore, in light of the "consensus of cases of persuasive authority," *Wilson v. Layne*, 526 U.S. 603, 617 (1999), that his blanket strip search policy was unconstitutional. As a "reasonably competent public official," *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982), the United States Marshal "should [have] know[n] the law governing his conduct," *id.*, and therefore "could not have believed that his actions were lawful," *Wilson v. Layne*, 526 U.S. at 617. The court's position in *Bame*, 637 F.3d at 386 — that the unanimous conclusion of ten circuits prior to the time of the challenged strip searches was insufficient to "clearly establish[]," *Wilson v. Layne*, 526 U.S. at 606, the illegality of the United States Marshal's actions as to non-detained arrestees — can hardly be reconciled with Supreme Court qualified immunity precedent. *See Bame*, 637 F.3d at 389–90 (Rogers, J., dissenting).

As binding precedent, *see LaShawn A. v. Barry*, 87 F.3d 1389, 1395 (D.C. Cir. 1996) (en banc), however, *Bame* controlled in the instant case even though since *Bame* was decided six Justices of the Supreme Court have expressed reservations concerning strip searches of the sort challenged here and in *Bame*. *See Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 132 S. Ct. 1510, 1523 (2012) (Roberts, C.J., concurring); *id.* at 1524 (Alito, J., concurring); *id.* at 1525 (Breyer, J., joined by Ginsburg, Sotomayor, and Kagan, JJ., dissenting). This development, combined with the Supreme Court's post-*Bame* admonition in *Camreta*, 131 S. Ct. at 2031, warrants deciding the Fourth Amendment issue, *see Johnson*, 734 F.3d at 1206–07 (Rogers, J.). Having twice avoided deciding the merits of the Fourth Amendment class-action challenges, the *en banc* court, by "following the two-step sequence [of *Saucier v. Katz*, 533 U.S. 194, 201 (2001)] — defining constitutional rights and only then conferring immunity — [would] clarify the legal standards governing public officials," *Camreta*, 131 S. Ct. at 2032. The prospect that

individuals arrested for exercising their First Amendment rights in the Nation's Capital, as in *Bame*, 637 F.3d at 383, or arrested for other non-violent, non-drug offenses, as the female appellants here, *see Johnson*, 734 F.3d 1194, may be subjected — when turned over by law enforcement officials to the United States Marshal for presentment in the D.C. Superior Court — to intrusive strip searches absent reasonable suspicion of carrying contraband is good reason for the *en banc* court to "clearly establish[]," *Wilson v. Layne*, 526 U.S. at 606, that Fourth Amendment protections against such suspicionless strip searches exist no less in the Nation's Capital than elsewhere in the United States.

Today, the *en banc* court may be comforted by the fact that the United States Marshal for the D.C. Superior Court changed his strip search policy *after* the *Johnson* appellants were strip searched. *See* Appellee's Br. 59 n.17. But the Marshal's prior policy could be reinstated at any time, even on an *ad hoc* basis. *See Johnson*, 734 F.3d at 1207 (Rogers, J.). So long as the law remains uncertain, the strip searches that occurred in *Bame* to First Amendment protesters and in *Johnson* to non-violent, non-drug female arrestees could occur again, and under *Bame* the United States Marshal again would enjoy qualified immunity. When the court is next confronted with this Fourth Amendment challenge, initial rehearing *en banc* will be appropriate. *See LaShawn A.*, 87 F.3d at 1395.